## REYNOLDS v. NEW YORK O. & W. RY. CO.
### No. 252.

Circuit Court of Appeals, Second Circuit.
June 9, 1930.

Kernan & Kernan, of Utica, N. Y. (Warnick J. Kernan, of Utica, N. Y., of counsel), for appellant.

Miller, Matterson & Quinn, of Syracuse, N. Y. (William F. Quinn, of Syracuse, N. Y., of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This appeal involves the legal effect of a rule of the defendant railroad company which provided that:

"When a train stops under circumstances in which it may be overtaken by another train, the flagman must go back immediately with flagman's signals a sufficient distance to insure full protection, immediately placing and leaving two torpedoes on the rail, and when necessary, in addition, displaying lighted fuses. * * *

"The front of the train must be protected in the same way when necessary by the baggageman, head trainman or fireman.

"When a train is moving under circumstances in which it may be overtaken by another train, the flagman must take such action as may be necessary to insure full protection. By night, or day when the view is obscured, lighted fuses must be thrown off at proper intervals. * * *

"Conductors and enginemen are responsible for the protection of their trains."

The same general rules contained the following definition of a "train": "Train. An engine, or more than one engine, coupled with or without cars, displaying markers."

In the present case a section gang consisting of four railroad employees, of whom plaintiff's intestate was one, had been engaged in removing a plank in front of the Parker Station on defendant's railroad. They had come to the station on a gasoline motor car known as a speeder, which they had placed on a switch off the main track. When they had finished their work there for the day, they lifted the car over upon the main track and started the speeder in a northerly direction toward Guilford, a place about 1¼ miles away, where they were to take care of the switch lights.

Before the speeder was placed back on the main track, a passenger train going north had run by Parker, which was a flag station, and had neglected to stop and leave a passenger. To the north of the station the track ran through embankments and curved westerly, so that the rear of the train could not be seen from the speed car, which was placed on the main track immediately after the train had run past the station.

The passenger train backed up to let the passenger off. The speed car came on toward it at a speed which finally reached about 20 miles an hour, and the four men on it at first could not see the train because it was hidden by the curve, and finally because they sat on the car with their backs toward the direction in which the train was coming. The gasoline motor of the speed car was operated by Eastwood, one of the four men in the section gang. Its motor was skipping, and Eastwood was down on his knees at the time of the collision trying to make it work properly. He met his death when the speed car ran into the train.

The conductor of the train appears to have been at the rear of the last car as his train started to back. He testified that as soon as he saw the speed car (and this was when it was about 300 feet from him) he signaled to stop his train, which was backing at the rate of 5 or 6 miles an hour, and that he succeeded in reducing the momentum so that his train was not moving when the speed car collided with it and plaintiff's intestate was thrown off and received injuries resulting in his death. He also testified that he and one of his crew vainly shouted as he saw the speed car coming down on the train, in order

to warn the intestate and his companions. One of the plaintiff's witnesses testified that the train was still "slowly" moving up to the time of the collision.

The flagman did not go back when the train stopped, nor was any action taken by the overtaken train to insure protection other than the blowing of three long whistles, which the engineer testified was a signal for the flagman to go back as required by the rule.

The defendant maintained a manual block signal system, and the passenger train was in the same block with the speeder when the latter was started and up to the time of the collision. The brother of plaintiff's intestate and a workman named Palmer, who were members of the section gang, testified that they knew this to be the case.

This action was brought under the Federal Employers' Liability Act (45 USCA §§ 51–59). The complaint alleged that the death of the intestate was due to the negligent operation of defendant's passenger train and speeder, in that the persons in charge of the signal system of the defendant and the switches leading upon the main track of defendant were negligent in allowing the speeder to be operated in close proximity to the rear of the passenger train and allowing the passenger train to back up against traffic in the same block while the speeder was moving in the same direction and that the persons in charge of the passenger train failed to give any warning of the fact that it was backing up.

The plaintiff introduced testimony that it was the custom when a train stopped or backed to send out a flagman to protect it against trains approaching from the rear, and the rule (No. 99) heretofore mentioned was also in evidence.

The defendant moved for a nonsuit because intestate was guilty of primary negligence, because plaintiff had failed to make out a cause of action, and because the risk, being obvious, was one which the plaintiff's intestate assumed. The motion was denied.

The trial court charged the jury that it was for them to determine whether the defendant was negligent in not observing the rule and conforming to the custom. From a judgment for the plaintiff, this appeal was taken.

 The rule and the alleged custom were almost identical. Each was violated, but neither can be regarded as relating to such an instrumentality as a speed car, or as intend-ed for the protection of its occupants. A speed car is not either an engine or an engine coupled with a car within the meaning of the rule, and therefore is not a train as defined therein. The rule was not designed to protect a train against a light gasoline car made to carry a few workmen and their tools or to protect section workmen. A speed car resembles the hand car which has long been used to carry railroad employees about. It could hardly endanger a train by colliding with it, and could be stopped within a distance of only about 30 feet even when going at a high speed.

As an original proposition, it might be contended that a train crew having the duty to send a flagman back in order to warn an approaching train were guilty of negligence which caused the collision when they failed to take these steps in the present case. But such an argument seems untenable after the decisions of the Supreme Court in Chesapeake & Ohio Ry. Co. v. Nixon, 271 U. S. 218, 46 S. Ct. 495, 70 L. Ed. 914, and Chesapeake & Ohio Ry. Co. v. Mihas, 280 U. S. 102, 50 S. Ct. 42, 43, 74 L. Ed. 207. In the former case a section foreman had borrowed from one of the railroad officials a three-wheeled velocipede which fitted the railroad tracks in order to go home on it from his work. While returning on it, he was overtaken by a train and killed. The Supreme Court held that the employee had assumed the risk of his employment, and that no cause of action would lie to recover for his death, though the engineer and fireman of the train were not on the lookout and if they had been the accident would not have occurred. In other words, the court held that there was no duty to warn track employees of an approaching train where their presence was not known. In Chesapeake & Ohio Ry. Co. v. Mihas, supra, there was proof of a custom to warn persons unloading cars on the tracks of the railroad of the approach of trains. Mihas, an employee, whose duty it was to care for switch lights along the right of way, was climbing over a coal car in order to reach a speeder car which he used in his work, when a string of cars propelled in a flying switch, struck standing cars, of which the coal car was one, with such violence as to throw him off and do him injury. Some men had been seen unloading coal from one of the standing cars shortly before the accident. The negligence complained of was that no warning was given to Mihas of the approaching string of cars, though it was the custom to give warning to all persons about the standing cars before shunting other cars.

Sutherland, J., writing for the court, stated that a verdict should have been directed for the defendant, and said:

"The evidence, however, is that the notification or warning was exclusively for persons, not employees, engaged in unloading cars. There was no custom or duty of that kind in respect of employees engaged on or about the tracks. If there was a violation of duty, therefore, on the part of the railway company, it was not of a duty owing to Mihas; and the rule is well established that it is not sufficient for a complainant to show that he has been injured by the failure of another to perform a duty or obligation unless that duty or obligation was one owing to the complainant. * * *

"There is nothing in the record to show that employees engaged in the switching operation knew or had reason to believe that Mihas was in any position of danger. In the absence of such knowledge or ground for belief, they were not required to warn him of the impending switching operation or take other steps to protect him. Toledo, St. L. & W. R. R. v. Allen, 276 U. S. 165, 173, 48 S. Ct. 215, 72 L. Ed. 513."

Plaintiff's intestate was not of the class for the protection of which the rule or custom was designed, and, under the decisions of the Supreme Court to which we have referred, and others, he assumed the risk of accidents ordinarily incident to his employment. Chesapeake & Ohio Ry. Co. v. Mihas, 280 U. S. 102, 50 S. Ct. 42, 74 L. Ed. 207; Chesapeake & Ohio Ry. Co. v. Nixon, 271 U. S. 218, 46 S. Ct. 495, 70 L. Ed. 914; Boldt v. Penn. R. Co., 245 U. S. 441, 38 S. Ct. 139, 62 L. Ed. 385; Di Caprio v. N. Y. C. R. Co., 231 N. Y. 94, 131 N. E. 746, 16 A. L. R. 940.

 It is, however, contended by the plaintiff that she may recover without regard to any violation of rule or custom by the backing train because Eastwood, who was operating the speed car, was negligent in running it at a high speed and allowing it to collide with the passenger train. But the difficulty with this contention is that the complaint did not seek to recover for the negligence of Eastwood, and, if negligence is to be imputed to defendant by reason of the acts of Eastwood, it should be amended before a new trial. The complaint based defendant's alleged negligence upon the theory that the persons "in charge of the signal system of defendant and the operation of the switches leading upon the main track * * * were negligent in allowing and permitting said speeder to be operated in close proximity to the rear of said passenger train and allowing said passenger train to back up against traffic in the same block while said speeder was moving in the same direction," and "that the persons in charge of said passenger train failed * * * to give any warning of the fact that it was backing up. * * *" In other words, failure of those in charge of the passenger train to flag the speeder, and not the carelessness of Eastwood, was the fault on which the plaintiff based her claim and the parties went to trial. It was the only negligence referred to in plaintiff's opening.

Before the accident, Eastwood was bending over, fussing with the gasoline engine to prevent it from skipping, and is said to have been operating the speed car. If, by acquiescence of the intestate, Eastwood was in charge of the operation of the car and by his negligence permitted it to run into the passenger train, that negligence would be imputable to the defendant, and the latter, under the Employers' Liability Act, would be unable to shield itself by the negligence of Eastwood, because he was a fellow servant of the intestate. Upon such a theory any carelessness of intestate in failing to look or warn might go only in mitigation of damages. But if the intestate was responsible for watching the track ahead while Eastwood was fixing his engine, and, by his own negligence, directly caused the collision, the plaintiff under such decisions as Davis v. Kennedy, 266 U. S. 147, 45 S. Ct. 33, 69 L. Ed. 212, and Unadilla Valley Railway Co. v. Caldine, 278 U. S. 139, 49 S. Ct. 91, 73 L. Ed. 224, would not be entitled to recover. The question whether intestate's neglect if under a duty to act was the primary cause of the collision may involve difficult considerations of law and fact which we do not pass upon on the present record. It is enough to say that, up to the time defendant moved for a nonsuit at the close of the evidence, no cause of action based upon the negligence of Eastwood had been asserted, and that it may be doubted whether the testimony as it stood sufficiently developed facts upon which a liability might be founded.

While this court would not reverse because the verdict was for excessive damages, it seems to us appropriate to say that there can be no doubt that the damages allowed were excessive. The wages of the intestate were $82 per month, or $984 per year. His life expectancy was shown to be approximately twenty-nine years, which would involve the receipt by him of $28,536 if he maintained good health and unimpaired effi-

ciency and worked every day until he died. Yet the verdict was $30,000. The present worth of the expected future earnings was manifestly much less. His only other source of income was from his home garden and a chicken business, the value of which was not shown. It is plain that, even if a good cause of action had been established, such a verdict should have been set aside as excessive unless the plaintiff would stipulate to reduce it to some reasonable amount to be fixed by the trial judge.

We hold that the train crew was not negligent because neither the rule nor the alleged custom was designed for the protection of plaintiff's intestate. If plaintiff wishes to rely upon a cause of action based on the negligence of Eastwood, she should seek to amend her complaint.

Judgment reversed.