MILLER v. CENTRAL R. CO. OF NEW JERSEY.

No. 307.

Circuit Court of Appeals, Second Circuit.

May 16, 1932.

Charles E. Miller, of New York City, for appellant.

Alfred T. Rowe, of New York City (Sol Gelb and Anthony Sansone, both of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

The deceased was a locomotive engineer employed upon a work train, a "work extra," of the defendant, moving east on a single track between a station known as Wareton, in New Jersey, and another known as Tom's River. It had been used to pick up spent rails which had been laid along the roadbed, and was carrying a gang of section men, who had been working on the track, and pulling their tool and camp cars, which had been added to the train. The deceased had turned over the operation of the locomotive to the fireman, as the rules allowed, if done under his supervision, and was himself firing the engine, on the left side. The driving cab was midway of the boiler, the firing was done at the rear, close to the tender, where the deceased stood. There was a brake at the rear by which he could have stopped the train from where he was.

An extra freight train, which was moving west from Tom's River, saw the "work extra" coming at a speed of about twenty-five miles an hour, stopped, and blew its whistle, but the fireman of the "work extra" did not see or hear the freight in time, and collided with it head on, killing the deceased. The reason for the fireman's failure to stop was that the road at the place in question turned to the left, so that he could see the track ahead for only three hundred feet,—un-

less he leaned out at the side,—and this was too short a distance. Had the deceased been watching from the left side he would have seen the extra freight, and could have stopped the train; his attention was apparently occupied by his firing.

 Rule 87 of the road provided that "inferior" trains must "keep out of the way of opposing superior trains, and failing to clear main track by the time required by rule must be protected by Rule 99." Rule 99 provided that trains, when stopped and if in danger of being overtaken, must send out a flagman behind, with torpedoes or fusees. The front of a train must be protected "in the same way when necessary by the front flagman or trainman." A moving train which may be overtaken must be protected by a flagman at the rear as may be necessary, who must in any event throw off fusees. No protection was provided by flagmen for moving trains likely to be met head on, and obviously none could be, unless they move at a man's pace. The evidence of the defendant's witnesses that the rule required a flagman to walk ahead of a moving "work extra" was absurd, if the train is to move at any substantial rate. Moreover, rule 99 itself is not susceptible of such an interpretation; flagmen are to be put out only in front of a train not in motion. Rule 105 provided that "both the conductor and the engineman are responsible for the safety of the trains and the observance of the rules," though the engineman must obey the instructions of the conductor in starting trains "unless they endanger the safety of the train or involve a violation of the rules" (rule 1400). A "work extra" is "inferior" to all other trains, including an "extra freight"; it must "protect itself against extras." Unless the conductor's order changed this, the deceased was bound to "protect" the "work extra" against the "extra freight."

█ It did not appear whether or not the conductor at Wareton learned from the dispatcher where the freight train was, but he told the fireman and the engineer to start up for Tom's River without disclosing its whereabouts, if he knew it. The extra freight was made up of two cars and a caboose; the "work extra," of eleven or twelve cars. There were several sidings between Tom's River and Wareton, on which the extra freight could have been shunted, but only one that would hold the "work extra." A regular passenger train was due at Tom's River at 2:12 and the "work extra" left Wareton at 1:30; the distance between the two stops is twelve

miles. The complaint charged negligence on the conductor's part in ordering the deceased to go to Tom's River without finding out whether there was any opposing train, and in causing the deceased to rely upon the implied assurance that none would be met on the way. The only question at issue is whether the judge should have taken the case from the jury.

If the "work extra," which had finished its work, was to run without stop between Wareton and Tom's River, a "running order" should have been issued, which would have given it precedence over the extra freight; it had no right to make such a run otherwise. Nobody suggests that there was such an order, and the conductor violated the rules by his order to the deceased to go to Tom's River. The defendant's train rule instructor was explicit as to this. Aside from this formal violation, the order was improvident anyway, unless the position of the freight was learned; it might be met en route, for it ran every day though not on schedule; and while the meeting need not be dangerous, it would involve some delay, especially if it occurred between sidings. The "work extra" at its maximum speed had only eight minutes to spare to reach Tom's River with five minutes clearance of the passenger train; if it met the freight between sidings it was easily possible that more time might be consumed before it could move on. The defendant suggests that it might have been split among various sidings to let the passenger train pass; but this too would take time, and, in combination with the necessity of finding a siding for the freight itself, created a situation which a jury might find altogether impracticable with the time at its disposal. We should think so ourselves. Thus the conductor's order might be considered as a fault; it certainly contributed to the collision.

 The defendant answers that even so, the deceased was equally at fault, for he should not have obeyed the conductor, as he knew that he had no "running order"; copies of all orders must go to the engineer as well as to the conductor. The only evidence for this is that the working orders in evidence, on which the "work extra" and the "extra freight" were operating, contained at their bottom the legend, "each person addressed must have a copy of this order." The defendant assumes that the engineer would be "addressed" in a "running order." If we take it that the legend describes a practice which was always followed, though this was not proved, nevertheless we cannot assume

that the deceased would be addressed in a "running order," merely because he was addressed in the working orders, or because a copy of the working order had been delivered to him. Probably this was true, but the judge could not dismiss the case, when the defendant failed to prove it. Moreover, even were we to suppose that there was evidence to that effect, it does not follow that the jury must accept it; the defendant had the burden, and the record on any showing was far from conclusive. Rather this was an afterthought upon the appeal. Thus on the record as it stands, the deceased was not required to disobey the conductor's order on the theory that it was dangerous, or in violation of the rules, merely because he had not received a copy of any "running order." The jury might find him justified in supposing that the "work extra" was no longer "inferior" to the extra freight, and could safely run straight through to Tom's River. If so, he was relieved of his duty to "protect" against that train, though he did remain generally "responsible" for the safety of his own.

▓▓▓ We assume for argument that he was negligent in this last respect, and that except for the statute the plaintiff could not recover. But it seems to us that the situation involved two concurring acts of contributory negligence, and was not one where the employee has disobeyed a rule and is "primarily" responsible. Frese v. Chicago B. & Q. R. Co., 263 U. S. 1, 44 S. Ct. 1, 68 L. Ed. 131; Davis v. Kennedy, 266 U. S. 147, 45 S. Ct. 33, 69 L. Ed. 212; Unadilla Valley R. Co. v. Caldine, 278 U. S. 139, 49 S. Ct. 91, 73 L. Ed. 224; Unadilla Valley R. Co. v. Dibble, 31 F.(2d) 239 (C. C. A. 2); Bradley v. Northwestern Pac. R. Co. (C. C. A. 9) 44 F.(2d) 683, 72 A. L. R. 1341. All these decisions involved specific precautions for specific occasions; the stopping of a train at a given spot until another passed, or until the track was clear. No doubt the doctrine is not confined to train movements, [Paster v. Pennsylvania R. R., 43 F.(2d) 908 (C. C. A. 2)]; but it does not seem to us to extend to rules generally enjoining caution, or responsibility,—in spite of some of our language looking to the contrary in Reynolds v. New York O. & W. R. Co. (C. C. A.) 42 F.(2d) 164. If it did, an employer could revive the defense of contributory negligence by imposing as an affirmative duty such care as is appropriate to the situation, which is just what the common law makes a condition upon recovery. The statute was designed to end that defense and cannot be so conveniently avoided; the

doctrine does not in our judgment apply, except when more definite commands are given to meet more definite situations; how definite we need not decide. Nor are those decisions in point which hold that the crews of an "inferior" train are not entitled to information of the whereabouts of others that they may meet. Rosney v. Erie R. Co., 135 F. 311 (C. C. A. 2); Great North. R. v. Hooker, 170 F. 154 (C. C. A. 8); Chicago R. I. & P. Ry. Co. v. Ship, 174 F. 353 (C. C. A. 8); Central R. Co. of New Jersey v. Young (C. C. A. 3) 200 F. 359, L. R. A. 1916E, 927. These involved yards, where such information is impracticable and probably worse than idle. This is not true of Little Rock & M. R. Co. v. Barry (C. C. A. 8) 84 F. 944, 43 L. R. A. 349, and Southern R. v. Hylton, 37 F.(2d) 843 (C. C. A. 6), which hold that, when a crew must look out for a train, or for a working crew ahead of it, they are not entitled to information as to where the danger will be found. But these decisions also are not apposite, if we assume that the deceased had warrant to suppose that the conductor's order was authorized and safe; they presuppose a duty to "protect" against all comers. Thus we think the situation at bar was the usual one of contributory negligence only.

▓▓▓ That the deceased was engaged at the time in interstate commerce seems to us plain. The removal of spent rails from beside an interstate track was as necessary as its repair; indeed a part of it, for it is absurd to suppose that a right of way is to remain incumbered with such refuse. The case falls within the doctrine of Pederson v. Delaware, L. & W. R. Co., 229 U. S. 146, 33 S. Ct. 648, 57 L. Ed. 1125, Ann. Cas. 1914C, 153, a case which has never been modified by the many which have followed. Philadelphia, B. & W. R. Co. v. McConnell, 228 F. 263 (C. C. A. 3), is on all fours; we concur in the ruling. See, also, Canadian Pac. R. Co. v. Thompson, 232 F. 353 (C. C. A. 1). The last decisions of the Supreme Court on which the defendant relies, concern wholly different situations. Chicago & N. W. Ry. Co. v. Bolle, 284 U. S. 74, 52 S. Ct. 59, 76 L. Ed. ——; Chicago & E. I. R. Co. v. Industrial Comm., 284 U. S. 296, 52 S. Ct. 151, 76 L. Ed. ——; New York, N. H. & H. R. Co. v. Bezue, 284 U. S. 415, 52 S. Ct. 205, 76 L. Ed. ——. They relate either to equipment which was not used for transportation at all, e. g., a station, or which, though so used, was still equivocal in its destination; that is, which might eventually go to the service of either interstate or intrastate transportation. So

far as we can find, it has never been doubted that a track used for both kinds is interstate; surely it cannot change its attribution as each train passes over it. Repairs to such a track—of which the removal of spent rails which have been replaced is a necessary part—are so directly connected with the track itself as to share its character. Hence we need not consider whether the carriage of the repair gang with their camp and cook cars, independently made the deceased's work a part of interstate commerce.

The exceptions to the charge we have examined and find without substance.

Judgment affirmed.