**OVERSTREET et al. v. NORTH SHORE CORPORATION.**

**SCOTT et al. v. SAME.**
**Civil Nos. 393–J, 588–J.**

District Court, S. D. Florida.
Sept. 28, 1943.

504

John E. Lake, of Jacksonville, Fla., for H. T. Overstreet and others.

Lucien H. Boggs, of Jacksonville, Fla., for William J. Scott and others.

W. Gregory Smith (of Smith & Axtell), of Jacksonville, Fla., for defendant.

DE VANE, District Judge.

These cases were consolidated for trial, and were tried at Jacksonville, Florida, on June 23–25 inclusive, 1943, before a Judge without a jury; as to case 393–J, upon the issues made by plaintiffs' second amended complaint (in which The North Shore Corporation is named as sole defendant), and the answer filed thereto by the defendant as to case 588–J, upon the complaint and answer of the defendants. At the commencement of the trial, plaintiffs in case 588–J announced that they also dismissed Bay Shore Water & Light Company as a party defendant. Therefore the word "defendant" as used herein will refer only to The North Shore Corporation.

Opinion.

The court, at the conclusion of the trial and arguments of counsel, announced its decision as follows:

It seems to me that the Supreme Court in its decision in this case, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. ——, left little for the trial court to do other than determine the amounts the several plaintiffs are entitled to recover when the case came back here for rehearing. While the Supreme Court in stating what was involved in the case used the allegations of the complaint in expressing the issues which it considered and decided, it is hard for me to see that many of the allegations of the complaint are of any particular importance now in disposing of the legal questions involved in this case and that view is substantially borne out by the more recent decision of the Supreme Court in McLeod v. Threlkeld et al., 319 U.S. 491, 63 S.Ct. 1248, 1250, 87 L.Ed. ——, decided June 7, 1943. In that case the Supreme Court, in referring to its decision in Overstreet v. North Shore Corporation, said: "Employees engaged in operating and maintaining privately owned toll road and bridges over navigable waterways are 'engaged in commerce'."

In reading the Overstreet case in the first instance, it seemed to me that was in effect and substance the court's holding and of course the language of the Supreme Court used in the McLeod case as to its holding in the Overstreet case very definitely confirms the fact that what the court held in the Overstreet case was that employees engaged in operating and maintaining a privately owned toll road and bridge over navigable waters are engaged in commerce and are subject to the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq.

On the basis of the decision of the court in the Overstreet case and its statement in the McLeod case of what it held in the Overstreet case, I hold that the Fair Labor Standards Act is applicable to all employees of The North Shore Corporation engaged in operating and maintaining the toll road and bridges which this company maintained and operated in Duval County.

The extent to which these employees were engaged in different activities, such as collecting tolls, operating draw bridges, repairs to road and bridges, and the operation of the telephone line, seems to me to be unimportant, although the testimony submitted shows that many of the employees devoted some part of their time to two or more of these several operations. It is my opinion that under the decision of the Supreme Court in this case there is

no legal necessity for a division of their time as between the time they worked on the highway, on the bridges, on the telephone line or any other incidental work they may have done pertaining to the operation of the toll road. They were covered by the Fair Labor Standards Act when performing any of these services. I therefore hold that the employees are entitled to compensation under the Fair Labor Standards Act for the full time they worked.

While I have sat here and permitted you gentlemen to make a record on the question as to the extent of use of this toll road by automobiles traveling in interstate commerce, it is my opinion that whether or not it was "substantial" is unimportant. This toll road being a public highway and being used as such and accessible to automobiles moving in interstate and intrastate commerce, and available to both classes of traffic on equal terms, and actually used by both classes of traffic, it is, in the opinion of the court, immaterial whether the percentage of interstate traffic is five percent, or twenty-five percent, or any other percentage. The court does not hold that an occasional or accidental interstate movement over this toll road would make this highway an instrumentality of interstate commerce, but it is my opinion that the evidence offered by the defendant as to the amount of interstate traffic using the highway is sufficient to bring the employees of the defendant within the Fair Labor Standards Act. As I construe its opinion, the Supreme Court held in this case that employees engaged in operating and maintaining a privately owned toll road and bridge over navigable waters are engaged in commerce and are subject to the Fair Labor Standards Act, and that their status under this act is not dependent upon whether the amount of interstate traffic is substantially, more or less.

After announcing its decision in the case, the court appointed an auditor to state and report the amounts due the several plaintiffs for unpaid wages, overtime wages and penalty, and having considered the pleadings, the evidence adduced at the trial, the stipulations of the parties and the auditor's report, the court makes the following findings of fact and conclusions of law.

### Findings of Fact.

1. Defendant The North Shore Corporation is a corporation organized and existing under the General Corporation Law of the State of Florida. It owns and operates the toll road hereinafter mentioned. This toll road is operated under and by virtue of a legislative franchise existing under Chapter 10490, Special Laws of Florida 1925, as amended by Chapter 12494, Special Laws of Florida 1927, and by virtue of compliance with the terms of those statutes. Chapter 10490, as amended, among other things includes the following provisions: "Sec. 4. That any road or roads and bridges constructed, operated and maintained under the provisions of this Act, on which a toll is collected, shall be open for traffic at any and all times and maintained in a condition safe and suitable for travel, and the tolls to be collected for travel thereon shall not exceed the following schedule, to wit:"

2. The toll road owned and operated by defendant connects with U. S. Highway No. 17 a short distance north of the municipal limits of the City of Jacksonville. U. S. Highway No. 17 is a national arterial highway connecting Jacksonville, the County Seat of Duval County, Forida, with New York City and points north. Defendant's toll road extends from its point of intersection with U. S. Highway No. 17 about seventeen miles in an easterly direction to a point near the westerly shore of Ft. George inlet where it comes to a dead end. At Pilotstown or Ft. George Post Office, the toll road connects with a county road serving solely Ft. George Island, thus the toll road affords the only means of land communication between Ft. George Island and the rest of the United States. The toll road was built and opened for traffic in 1928.

3. On the toll road are located three bridges over navigable streams, one over Cedar Creek, one over Clapboard Creek, and one over Sisters Creek. The drawbridge over Cedar Creek and the one over Clapboard Creek are hand-operated, and no proof has been adduced showing that any interstate commerce has been transported through the waterways flowing under these bridges since the effective date of the Fair Labor Standards Act. Sisters Creek is a part of the intercoastal canal extending from Miami to New York City, and that portion of the canal is constantly used in interstate commerce by pleasure craft and freight vessels plying between Florida and the states lying to the north thereof. The drawbridge operated by defendant over Sisters Creek is constantly raised and lowered to permit passage of boats engaged in

interstate commerce. Reports made officially by the Chief of Engineers of the United States Army show the following figures as to commerce in this portion of the canal for the years 1938, 1939 and 1940:

| Year | Vessel Traffic tons | Rafted tons | Total tons | Passenger, recreational |
|------|--------------------|-------------|-----------|------------------------|
| 1938 | 159,296 | 2,361 | 161,657 | 24,300 |
| 1939 | 267,832 | 1,044 | 268,876 | 15,900 |
| 1940 | 287,355 | 52 | 287,407 | * |

Of the foregoing freight tonnage the following represented through traffic for the year 1940, the remainder being local: Northbound—total 144,450 tons; southbound—total 85,164 tons.

*Beginning 1940 passengers on charter and excursion boats only are included.

4. On Ft. George Island are located two "exclusive" social clubs, Ribault Club and Ft. George Club. In normal times these clubs are open from December to April, Florida's usual winter social season. During the season of 1942–43 on account of the war, Ribault Club did not open. The record shows that for the years indicated, patronage at these clubs was as follows:

| Ft. George Club | 1938–1939 | 45 |
|-----------------|-----------|----|
| | 1939–1940 | 42 |
| | 1940–1941 | 59 |
| | 1941–1942 | 14 |
| | 1942–1943 | 9 |
| Ribault Club | 1941–1942 | 88 |

Nearly all this patronage comes from outside of Florida and it was established that the guests arrived at these clubs in three different ways: (1) By rail to Jacksonville and by the club station wagon or taxicab from Jacksonville over the toll road to the clubs; (2) by travel in automobiles directly from out of state points to the clubs; and (3) by yachts over the inland water-way. For the most part, out of state members and guests reached the clubs by the first mentioned mode of transportation.

5. Located on the toll road and served by it are several fishing camps which rent boats to fishermen, sell them bait, rent them tackle and generally cater to their needs. Several of these places serve light meals. Most of them carry a stock of cracker sandwiches and food for light lunches which fishermen might take in boats with them. These camps are open to and frequented by the public who travel to and from the same in automobiles which use the toll road. The defendant also advertises points of interest along the highway inviting the tourist travel to the state to visit these points of interest.

The evidence as to the percentage of automobiles bearing out of state license plates that use the highway annually since the effective date of the Fair Labor Standards Act is extremely unsatisfactory except for a short period prior to the hearing in this case, and this evidence shows that the overwhelming majority of the automobiles moving over the highway since gasoline rationing went into effect bear Florida license plates.

Every merchant with a place of business on the toll road testified at the hearing and only one such merchant testified that he received interstate shipment of goods, and he testified to the receipt of only three such shipments. There was some further testimony of additional movements of merchandise over the highway, but the total of all such movements was not in excess of fourteen in the period from 1938 to 1942, inclusive.

However, it is clear from the evidence in the case that the toll road was at all times open to interstate traffic of every kind and character on the same terms as intrastate traffic moved over the road. It appears from the evidence in the case that the interstate use of the road was neither occasional nor accidental. The evidence establishes and in fact defendant admits, that the toll road is used in interstate commerce. The court makes no specific finding that such use was "substantial", nor does the court make any finding that such use was extensive as the court has held that jurisdiction does not depend upon such use.

6. The United States Mail is delivered and collected once a day six days a week over the full length of the toll road to the Post Office on Fort George Island, delivering and collecting letter mail and parcels to and from persons residing along the line of the road. This mail service includes the settlements of New Berlin and Dame's

Point, Florida. The United States census shows population figures as follows:

|  | 1930 | 1940 |
|---|---|---|
| Fort George Island | 76 | 98 |
| New Berlin Township (including settlement at Dame's Point) | 228 | 584 |

7. Bayshore Water & Light Company, a corporation, is a subsidiary of The North Shore Corporation, and is owned and controlled by the same interests. Bay Shore Water & Light Company owns and controls a telephone line connecting with the Southern Bell Telephone & Telegraph Company at Jacksonville, Florida, over which the residents and visitors of Fort George Island and its environs served by the toll road, make and receive long distance calls to and from all parts of the United States, for hire, which telephone line, until March 31, 1942, was operated and maintained by the plaintiffs and other employees of The North Shore Corporation. The telephone line is a public service, and is used by the public at large for a toll charge. It is also used by the Western Union Telegraph Company and the Postal Telegraph Company, to render telegraphic service to those residing on Fort George Island and its environs. So far as concerns all plaintiffs in this case rendering service to Bay Shore Water & Light Company, up to and including March 31, 1942, their wages were paid solely by defendant.

8. Throughout the period from the effective date of the Fair Labor Standards Act (October 24, 1938) to the present time, the toll road has been continually used by automobiles bearing license tags from states other than the State of Florida. Except during a limited period during the year 1942, no accurate record was kept by anyone showing the proportion of total automobile traffic on said road represented by cars bearing foreign licenses. Estimates of witnesses range from a maximum of 33⅓% (according to certain of plaintiff's witnesses) to a minimum of 5% (according to certain of defendant's witnesses). No record has been kept showing what proportion of the cars bearing foreign license tags were actually travelling in interstate commerce.

9. Throughout the period from the effective date of the Fair Labor Standards Act (October 24, 1938) to the present time there has been a flow of interstate commerce over defendant's toll road the amount of which is not mathematically ascertainable from the evidence herein, either in percentage of total traffic or otherwise; but even disregarding such evidence adduced by plaintiff's witnesses, according to defendant's own witnesses, such flow of commerce has been sufficiently constant to be neither occasional nor accidental. Throughout said period, up to and including March 31, 1942, there has been a like flow of interstate telephone and telegraph messages over the telephone line of Bay Shore Water & Light Company.

10. All of the plaintiffs in case 393-J-Civil were employed by defendant at divers times since the effective date of the Fair Labor Standards Act. Their respective duties were as follows:

(a) J. F. Booth: Foreman of maintenance on toll road and bridges, and the telephone line of Bay Shore Water & Light Company, but not employed in an executive, administrative or professional capacity.

(b) J. A. Lang, Isadore Barnett, Amos Harris, N. Lang, Jr., and R. Brazle: Laborers employed under the direction of the foreman to maintain and repair the toll road, bridges, and telephone lines.

(c) M. E. Nowlin, N. W. Smith, R. S. Simmons, F. C. Smith, G. A. Pereira and L. L. Garvin: Toll collectors whose duty it was to sell tickets for vehicles using the toll road, and to collect such tickets; also to make telephone connections with Southern Bell Telephone & Telegraph Company for the transmission of telephone and telegraph messages over the line of Bay Shore Water & Light Company.

(d) W. R. Stewart: Toll collector with duties as stated for the employees listed in sub-paragraph (c) above. Some time after the termination of Stewart's services as toll collector he was re-employed by defendant as maintenance foreman with duties similar to those stated for plaintiff Booth in sub-paragraph (a) above, except that Stewart had nothing to do with the repair or maintenance of the telephone line.

(e) H. T. Overstreet: Bridge tender whose duty it was to raise and lower the drawbridge over Sisters Creek. After termination of Overstreet's services he was succeeded in that position by plaintiff M. E. Nowlin, following the services which Nowlin rendered as toll collector described in sub-paragraph (c) above. The claims of Overstreet and Nowlin as bridge tender

have been settled in full, with the exception of attorneys' fees, as hereinafter referred to. Therefore further description of their duties as bridge tender, or statement of their periods of service, hours of work, and rates of pay as such, is unnecessary.

11. All of the plaintiffs in case 588–J–Civil were employed by defendant at divers times since the effective date of the Fair Labor Standards Act, as toll collectors, with duties as set forth in finding 10(c) above.

12. The respective services of the plaintiffs in each of the cases above named were necessary to the maintenance and use of the toll road and telephone lines in interstate commerce.

13. With respect to each of the plaintiffs in case 393–J–Civil, defendant has failed to pay to them the amounts of money to which they were entitled under the Fair Labor Standards Act, for minimum wages and for overtime, either or both, with a resulting penalty to defendant of 100% of the amount of such deficiency. The amounts found due the several plaintiffs in said case, including the penalty aforesaid, but exclusive of attorneys' fees, are as follows:

| | |
|---|---|
| Isadore Barnett | $  321.74 |
| J. F. Booth | 669.44 |
| R. Brazle | 218.56 |
| L. L. Garvin | 2,688.14 |
| Amos Harris | 451.91 |
| J. A. Lang | 430.97 |
| N. Lang, Jr. | 412.17 |
| M. E. Nowlin | 261.56 |
| G. A. Pereira | 2,384.92 |
| R. L. Simmons | 2,497.63 |
| E. W. Smith | 5,146.07 |
| Frank Smith | 2,944.72 |
| W. R. Stewart | 1,021.95 |

14. With respect to each of the plaintiffs in case 588–J–Civil, defendant has failed to pay to them the amounts of money to which they are entitled under the Fair Labor Standards Act for minimum wages and for overtime, either or both, with a resulting penalty to the defendant of 100% of the amount of such deficiency. The amounts found to be due the several plaintiffs in said case including the penalty aforesaid, but exclusive of attorneys' fees, are as follows:

| | |
|---|---|
| Ruben Knox | $1,160.38 |
| William J. Scott | 544.44 |
| W. M. Young | 474.64 |

15. In addition to the amounts found due the several plaintiffs in case 893–J–Civil in finding No. 13 above, the following are reasonable amounts to be allowed for the services of plaintiffs' attorneys herein rendered.

(a) For services in prosecuting the claims of plaintiffs H. T. Overstreet and M. E. Nowlin as bridge tenders of Sisters Creek drawbridge to final conclusion, as represented by stipulation of said plaintiffs with defendant, approved by order of court entered April 1, 1943 (after rendition of the decision of the United States Supreme Court in this case), and resulting in the payment of the following sums to said plaintiffs in satisfaction of such claims: To H. T. Overstreet $338.95; to M. E. Nowlin $2632.34—a total attorneys' fee of $1,000. Against that allowance should be credited $500 paid by defendant upon the approval of said stipulation, leaving a net attorneys' fee for the services stated in this paragraph of $500.

(b) For all other services rendered by plaintiffs' attorneys in this case, including services rendered to plaintiff Nowlin with regard to his services with defendant other than as bridge tender, $1,000.

16. In addition to the amounts found due the several plaintiffs in case 588–J–civil in finding No. 14 above, a reasonable amount to be allowed as attorneys' fee in that case would be the sum of $210.

### Conclusions of Law.

1. Each of the plaintiffs in case 393–J–Civil was engaged in commerce all during their several periods of employment by defendant, is within the coverage of the Fair Labor Standards Act, and is entitled to recover from the defendant The North Shore Corporation the several sums of money found to be due them under finding No. 13 above, together with an additional amount as attorneys' fee as stated in finding No. 15 above.

2. Each of the plaintiffs in case 588–J–Civil was engaged in commerce all during the several periods of employment by defendant, are within the coverage of the Fair Labor Standards Act, and are entitled to recover from the defendant The North Shore Corporation the several sums of money found to be due them under finding No. 14 above, together with an additional amount as attorneys' fees as stated in finding No. 16 above.