**NORTH SHORE CORPORATION v. BARNETT et al.**

No. 10881.

Circuit Court of Appeals, Fifth Circuit.

June 9, 1944.

Rehearing Denied July 11, 1944.

SIBLEY, Circuit Judge, dissenting.

Before SIBLEY, McCORD, and LEE, Circuit Judges.

LEE, Circuit Judge.

Appellees, employees of appellant, brought this action under Section 16(b) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 216(b), to recover alleged unpaid minimum wages and overtime pursuant to Sections 6 and 7 of the Act, 29 U.S.C.A. §§ 206, 207. A motion to dismiss was granted as to certain of the employees.[1] This Court affirmed.[2] The Supreme Court reversed and remanded the case for further proceedings. 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656. The case was thereupon tried to the Court without a jury and resulted in a judgment awarding to each appellee specific unpaid wages, overtime compensation, penalties, and attorney's fees. This appeal presents the question whether appellees, as held by the Court below, were covered by the Act; and, if so, whether some of the employees were exempt under Section 13(a) (11), 29 U.S.C.A. § 213(a) (11), which exempts "any switchboard operator employed in a public telephone exchange which has less than five hundred stations."

Appellant is a Florida corporation which owns and operates a toll road in the State of Florida, connecting with U. S. Highway No. 17, a national arterial highway, a short distance north of the limits of the city of Jacksonville, Florida. The toll road extends from the national highway in an easterly direction to a point near the western shore of Fort George Inlet. It connects with a county road serving Fort George Island and affords the only means of communication by land between Fort George Island and the outside world. It crosses by means of drawbridges three navigable streams, Cedar Creek, Clapboard Creek, and Sisters' Creek. It was built and opened for transportation in 1928. Tolls are collected by authority of Acts of the Florida Legislature, by which it is required that the road "be open for traffic at any and all times and maintained in a condition safe and suitable for travel * * *."

A wholly owned subsidiary of the appellant, namely, Bayshore Water & Light Company, owns and operates a telephone line which parallels the toll road, serves the same territory, and connects with the Southern Bell Telephone & Telegraph Company, a national telephone system, in Jacksonville.

The Court below found that while the amount of interstate commerce over the toll road "is not mathematically ascertainable from the evidence * * *, either in percentage of total traffic or otherwise; * * * according to defendant's [appellant's] own witnesses, such flow of commerce has been sufficiently constant to be neither occasional nor accidental."[3] The Court below also found that "throughout said period, up to and including March 31, 1942, there has been a like flow of interstate telephone and telegraph messages over the telephone line * * *." 52 F. Supp. 503, 507. The evidence fully supports these findings.

Some of the appellees were engaged in the repair and maintenance of the toll road and bridges and the telephone line; others served as toll collectors, selling and collecting tickets issued for vehicles using the road. These toll collectors also made telephone connections for transmission of telephone and telegraph messages over the telephone line.

The Supreme Court in Overstreet v. North Shore Corporation, 318 U.S. 125, 132, 63 S.Ct. 494, 499, 87 L.Ed. 656, speaking of the toll road said:

"Petitioners, who are engaged in operating and maintaining respondent's facilities

---

[1] Overstreet v. North Shore Corporation, D.C., 43 F.Supp. 445.

[2] Overstreet v. North Shore Corporation, 5 Cir., 128 F.2d 450.

[3] Appellant's witnesses testified that from five to eight per cent of the cars on the toll road bear foreign licenses. Appellees' witnesses placed the percentage from twenty to thirty-three and one-third per cent.

so that there may be interstate passage of persons and goods over them, are so closely related to that interstate movement as a practical matter that we think they must be regarded, under the allegations of their complaint, as 'engaged in commerce' within the meaning of §§ 6 and 7 of the Act."

The three appellants in that case were serving as a bridge tender, a toll collector, and a maintenance laborer, respectively.

■ Appellant contends that such holding must be interpreted in the light of the allegations of the complaint, necessarily admitted for the purpose of the motion to dismiss, in which the interstate use of the toll road and bridges was alleged to be extensive. We do not find, however, that the Court rested its holding upon the alleged extensive use; we think a careful reading of the opinion justifies the view that the holding is based upon the fact of interstate use rather than upon the extent of such use.[4]

Appellant further contends that the toll road and bridges are not instrumentalities of interstate commerce because the evidence established that only a small portion of the traffic over them was interstate in character. Appellant relies strongly on Walling v. Jacksonville Paper Co., 317 U. S. 564, 572, 63 S.Ct. 332, 337, 87 L.Ed. 460, holding that "If a substantial part of an employee's activities related to goods whose movement in the channels of interstate commerce was established by the test we have described he is covered by the Act," and upon cases holding that an employee is not within the coverage of the Act when his duties of an interstate character are so insignificant as to be within the principle of de minimis non curat lex.

■ The law as laid down in Walling v. Jacksonville Paper Co., supra, is applicable to that class of cases which deals with employees whose duties relate in part to interstate shipments. It is not applicable to that class of cases which deals with employees having to do with maintenance or operation of instrumentalities of commerce.

Employees in the first class engage during the same work-week in activities strictly interstate in character and in activities strictly intrastate in character. Employees in the second class of cases, as here, engage in the same type of activities throughout each work-week. In the case before us the appellees are not concerned with goods or persons moving between two or more states by means of instrumentalities of interstate and intrastate transportation. They are concerned (1) in maintaining an instrumentality of transportation over which goods and persons in interstate and intrastate movements alike are being transported, and (2) in maintaining and operating an instrumentality of communication over which messages and telegrams in interstate and intrastate transactions alike are being transmitted.

"A track or bridge may be used in both interstate and intrastate commerce, but when it is so used it is none the less an instrumentality of the former; nor does its double use prevent the employment of those who are engaged in its repair or in keeping it in suitable condition for use from being in an employment in interstate commerce." Pedersen v. Delaware, Lack. & West. R. R. Co., 229 U.S. 146, 152, 33 S.Ct. 648, 650, 57 L.Ed. 1125.

See also Miller v. Central R. Co. of New Jersey, 2 Cir., 58 F.2d 635.

The toll road and the telephone line are links in national transportation and communication systems. They are open and available at all times for interstate use. If the application of the Fair Labor Standards Act to employees engaged in maintaining the one and in maintaining and operating the other depends on the extent of the use of each in interstate commerce, then such use would make coverage often depend

---

4 In McLeod v. Threlkeld, 319 U.S. 491, 494, 63 S.Ct. 1248, 1250, 87 L.Ed. 1538, it is indicated that the rationale of the holding in the Overstreet case that the employees in that case were "engaged in commerce" was the fact that they were engaged in operating and maintaining toll roads and bridges over navigable waters and selling and collecting tickets for vehicles using the road. Mr. Justice Reed, as the organ of the Court, citing the Overstreet case, said: "Employees engaged in operating and maintaining privately owned toll roads and bridges over navigable waterways are 'engaged in commerce.'"

Mr. Justice Murphy dissenting in the McLeod case, in referring to the Overstreet case in which he was the organ of the Court, said: "We have held that * * * a seller of tickets on a toll bridge over which interstate traffic moves * * * [is] 'engaged in commerce' within the meaning of the Fair Labor Standards Act."

on adventitious and remote factors, at times even the weather. If coverage depends on the amount and character of traffic handled, which may fluctuate or alter from week to week, then employees engaged in maintaining the toll road and in maintaining and operating the telephone line may be under the Act one week and not under the Act the next. Such construction would to a certain degree render the Act nugatory.

In The Daniel Ball, 77 U.S. 557, 565, 10 Wall. 557, 19 L.Ed. 999, the Supreme Court said:

"* * * So far as she [The Daniel Ball] was employed in transporting goods destined for other states, or goods brought from without the limits of Michigan and destined to places within that State, she was engaged in commerce between the states, and however limited that commerce may have been, she was, so far as it went, subject to the legislation of Congress. She was employed as an instrument of that commerce; for whenever a commodity has begun to move as an article of trade from one State to another, commerce in that commodity between the States has commenced. The fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one State, and some acting through two or more States, does in no respect affect the character of the transaction. To the extent in which each agency acts in that transportation, it is subject to the regulation of Congress."

In Schmidt v. Peoples Telephone Union of Maryville, Mo., 138 F.2d 13, 15, in which the trial Court had referred to the number of interstate telephone messages as "trifling," the Eighth Circuit Court said:

"The test here is not the amount of revenue derived by the employer from interstate calls nor the number of such calls in interstate commerce. We are not dealing with a situation where some inconsequential incident of interstate commerce happens to result from the general conduct of a fundamentally intrastate business. Here, the employer offered a continuous service to and from six towns in a state other than the state wherein its exchange was located. The employer admittedly was immediately and directly engaged in interstate commerce and held itself out as furnishing interstate communication service both to its subscribers and to the general public. The nature of the employer's business here was such, by virtue of its being engaged directly and immediately in interstate commerce, that the employees, whose duty it was to handle such interstate communications, were clearly within the express language used by Congress in the Act and are covered, unless there is some specific exemption therefor." [5]

The Act exempts telephone and switchboard operators of a particular class. It does not exempt toll collectors and ticket sellers who may also operate a switchboard along with their other duties. The time spent by the toll collectors and ticket sellers in exempt activity and in nonexempt activity cannot be segregated. Such employees obviously are not within the Act's exemption.

The Act is remedial. Under the facts, the Act is clearly applicable.

The judgment appealed from is correct and it is accordingly
Affirmed.

SIBLEY, Circuit Judge (dissenting).

The judgment about to be affirmed awards each employee of the toll road minimum wages, overtime pay, and penalties for every work-week since the Fair Labor Standards Act went into effect, although there is no finding of fact that in all work-weeks or in any one of them a substantial amount of interstate commerce was done in which any employee could have been engaged. The theory advanced is that because the road was open for general commerce it became an "instrumentality of interstate commerce" so soon as any interstate commerce was done and continued to be such so long as it was kept open, so that everyone employed about it was at all times "engaged in interstate commerce." The district judge and the majority of this court seem to think this is required by the opinion of the Supreme Court in Overstreet v. North Shore Corporation, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656. The district judge said: "The Supreme Court in its decision * * * left little for the trial court to do other than determine the amounts the several plaintiffs are entitled to recover. * * *. As I construe its opinion the Supreme Court held in this case that the employees engaged in operat-

[5] See also National Labor Relations Board v. J. G. Boswell Co., 9 Cir., 136 F.2d 585, 589.

ing and maintaining a privately owned toll road and bridge over navigable waters are engaged in commerce and are subject to the Fair Labor Standards Act, and that their status under the Act is not dependent upon whether the amount of interstate traffic is substantial, more or less." Though deeming it unimportant, he found as facts that the "overwhelming majority of the automobiles * * * bear Florida license plates"; that every merchant having a place of business on the road had testified and only one had received interstate shipments and he only three of them; and the "total of interstate shipments did not exceed 14 in the period from 1938 to 1942 inclusive." He refused to find that the use of the road for interstate commerce had been "extensive" or "substantial", but thought it enough that it was open to such use and was so used. The majority opinion also says: "We think a careful reading of the opinion (in the Overstreet case) justifies the view that the holding is based upon the fact of interstate use rather than upon the extent of such use."

This, I think, is a serious misunderstanding of the Overstreet decision. The sole contention there was that the employer was not the carrier of interstate commerce, and therefore, as the court states it, "their (the employees') activities are local and at most only affect commerce." 318 U.S. 128, 63 S.Ct. 496, 87 L.Ed. 656. There was no question as to the amount of interstate commerce done, for the petition, the court says, alleged: "The toll road constitutes an integral part of the highway system of the United States * * *. It is used extensively by persons and vehicles traveling between the island and points outside Florida in interstate commerce. Mail to and from other states as well as goods produced outside Florida and consigned to merchants on the island are transported over the toll road. * * * We think these allegations bring petitioners within the coverage of the Act and entitle them to recover if proved." The Court then settled the contention made, assuming "extensive" interstate transportation actually done, and held the work of the employees was close enough to that transportation to be practically a part of it. It certainly did not say how much of a mixed employment must be in interstate commerce as compared with what is intrastate, in order to apply the Act; which is the present question.

If the road had been used for interstate traffic only, the rule here acted on would be correct; its employees would be engaged in such commerce all the time, whether it were great or small. But this is not an interstate road. It is not "an integral part of the highway system of the United States" and never will be. It is a dead-end country road along the north shore of the St. John's River to Pilottown at its mouth where some river pilots live, being the village postoffice called Fort George. The population is less than 100. There is little reason for or likelihood of any interstate traffic. As has been stated, the district court found that such traffic in goods was almost nil; and the overwhelming part of the passing vehicles bore Florida license plates. There is dispute in the evidence as to how many bore foreign plates, but that a car bore a foreign plate does not, as the witnesses all say, prove that it was on an interstate trip over this road; for all Florida is full of persons temporarily there with their cars, for war work, military service, or pleasure, using their cars with foreign plates every day. There is only a possibility that some of the foreign cars passing had come direct from another State. If any were going to the fishing camps testified about, it was only in the fishing season; and if any were going to the "exclusive clubs" on the Island, the out-of-State patrons were few and only during the winter season when the clubs were open. It is hard to imagine why any interstate traveller would wish to go to Pilottown, and none is definitely shown ever to have gone there. Mere sightseers would almost certainly be on intrastate trips out of Jacksonville. The mail did pass each way once a day except Sundays, in charge of an employee of the United States who paid no toll. This was not interstate commerce in a constitutional sense, but the exercise of a governmental function under the postoffice and postroads clause of the Constitution. There is no proof that any of the mail was interstate in fact, though witnesses say some probably was. The commerce done on the intercoastal canal, facilitated by the drawbridge, has been put out of the case by settling according to the Act with Overstreet and the other bridgetenders. The maintenance men did no repairs (save one time) on the drawbridge as such, but worked only on the plank surfacing which was part of the toll road and did not facilitate the canal commerce.

It is perfectly clear that both the toll-takers, who dealt directly with the traffic on the road, and the maintenance men who did not, but whose work was so near that traffic as to be practically a part of it, were engaged principally in intrastate commerce, with a small admixture of interstate commerce. Is that admixture, not exactly determined or determinable, sufficient to make these men "engaged in interstate commerce" under the Act? No one contends that an employee must be wholly so engaged. No one hitherto has contended that a very slight admixture of interstate commerce will suffice. The Act itself, in Section 13, 29 U.S.C.A. § 213, excluded certain employments, as agriculture, catching fish, seamen, switchboard operator in a small telephone exchange, but did not say what proportion of the employee's time and effort must be given to the excluded activity to effect an exclusion. In only one case was attention given to a possible mixed employment, in excluding "any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce." Sect. 13(a) (2). Preponderance is here made the test as between service in interstate and in intrastate commerce. It is a logical and reasonable test, and would afford a fair test in all mixed employments. This court, however, in Fleming, Adm'r, v. Jacksonville Paper Co., 5 Cir., 128 F.2d 395, 397, suggested that if "a substantial part" of the employee's mixed work was in interstate commerce it was enough. That language was repeated by the Supreme Court on review of the case, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460. That may be said to be the judicial formula. After the decision of Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, which applied the Act to the maintenance employees of the owner of a building whose tenant was using it wholly for the production of goods for commerce, the Administrator was confronted with the case of a building only partly used for such production. He applied the judicial formula of "substantial part", and by a rule published Oct. 17, 1942, directed that 20% should be considered substantial. When he had a case of mixed employment by trolley and bus carriers, exempt under Sect. 13(a) (9), he on March 6, 1944, applied the same ratio of 20%. We therefore have the legislative suggestion of preponderance, the judicial formula of substantial part, and the administrative crystallization of 20% to choose between. But no choice need be

made, because the fact-findings are that the admixture of interstate commerce done was not "extensive", nor even "substantial", and certainly nowhere near 20%. The district judge called it a "flow", but the evidence shows it to be a mere trickle, and (except for the mail) seasonal and intermittent. None is proved with certainty.

The toll-takers have the larger recoveries, one for over $5,000, more than twice his agreed salary already paid. This is because their jobs were very light, an average of 125 cars passing in 24 hours, and the hours of service were long, causing much overtime. For not one of the work-weeks for which each claims and is awarded overtime pay and penalties is it proven that he in fact handled a single car travelling interstate, yet his right depends absolutely on his proving for each work-week that he was engaged in interstate commerce. All one can spell out of the evidence is that he might have been in some of the weeks so engaged to a slight extent. It seems to me that his recovery has no certain basis other than that he saw the postman pass by every day.

The telephone line is a mere make-weight, not mentioned in the Overstreet case. It is a two-wire country line costing originally about $800, and intended for use about the toll road. Some stores and fishing camps were allowed to put in 'phones and the toll-takers made their connections. Some interstate communication occurred by connecting with the Jacksonville switchboard, but weeks and months passed when there was none. The toll-takers as small switchboard operators were excluded under Sect. 13(a) (11), but no one contends that their telephone work was enough to exclude them altogether if they were otherwise engaged in interstate commerce. The road maintenance crew also kept up the telephone line, but work on it was occasional and insignificant. The line since 1942 has been operated by another company and its employees, and the line kept up by a single man. It adds nothing to this case.

The toll road also has now been turned over to the County, because unprofitable. The County employees are not under the Act. The former employees are out of a job. The policy and purpose of the Act as declared in Section 2, 29 U.S.C.A. § 202, to improve wages without producing unemployment, has been frustrated. I think the decision is wrong in its philosophy and most unjust in its results.