**BRACEY et al. v. LURAY.**

No. 5096.

Circuit Court of Appeals, Fourth Circuit.

Sept. 16, 1943.

Harry E. Goertz and Joseph Loeffler, both of Baltimore, Md. (Bernard J. Medairy, of Baltimore, Md., on the brief), for appellants.

William Saxon, of Baltimore, Md. (Louis Samuels, of Baltimore, Md., on the brief), for appellee.

Douglas B. Maggs, Sol., and Bessie Margolin, Asst. Sol., both of Washington, D. C., Beverly R. Worrell, Regional Atty., of Richmond, Va., and Morton Liftin and Frederick U. Reel, Attys., U. S. Department of Labor, both of Washington, D. C., on the brief), for Administrator of Wage and Hour Division, U. S. Department of Labor, as amicus curiae.

Before PARKER, SOPER, and NORTHCOTT, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal from a judgment for defendant in actions instituted by workmen to recover unpaid minimum wages, overtime compensation, etc., under section

16(b) of the Fair Labor Standards Act, 52 Stat. 1069, 29 U.S.C.A. § 216(b), and consolidated for trial in the court below. The defense was that defendant was a retailer and not subject to the provisions of the act and that plaintiffs were not engaged in commerce or in the production of goods for commerce within the meaning of the act. The court below held that defendant was not a retailer within the meaning of the act but that only 4% of the business done by defendant was "in commerce" within its meaning and that plaintiffs had failed to show what portion of their time was devoted to such business. As to the remainder of defendant's business, the holding was that what was done by plaintiffs was not "in commerce" or in the production of goods for commerce within the meaning of the act.

Defendant is a dealer in scrap iron doing a gross business of from $125,000 to $150,000 per year. His purchases are almost entirely within the state of Maryland and only about 4% of his sales is to purchasers outside the state. Approximately 96% of his sales are to scrap dealers for delivery to shipbuilding plants, where the scrap is fabricated into material used in the manufacture of ships that operate in interstate and foreign commerce. Plaintiffs handle the scrap for defendant, unloading, assorting, cutting, and loading it into railroad cars in the course of defendant's business. The facts as specifically found by the court below, are as follows:

"The defendant company did a gross business of from $125,000 to $150,000 a year, on the average, during the period in suit. During this period—approximately four years,—its total business, involving sales that were directly interstate, that is to say, sales which it itself made to parties outside the State of Maryland, amounted to something less than $20,000. Therefore, these gross sales averaged per year only approximately $5,000, or less than 4% of the defendant's total annual gross business. During this entire period the defendant bought at points outside of the State and hauled into the State only about $1,000 worth of scrap which the various plaintiffs handled in one way or another, that is, they piled, cut and assorted it, and reloaded it into cars and trucks. * * *

"We now turn to consider whether the plaintiffs are also entitled to invoke the Fair Labor Standards Act with respect to the other, and by far the larger part of defendant's business in which they were involved, as follows: scrap iron and other metals of all kinds were delivered to the defendant in small lots by peddlers, all such deliveries being from points within the State of Maryland. The plaintiffs assorted and otherwise prepared—which sometimes required cutting,—the scrap for loading and assisted in loading it into railroad cars, for the most part, which were spotted either in defendant's yard or on Pennsylvania Railroad sidings near by, and occasionally in trucks,—for shipment to twelve firms that were wholesalers of scrap-iron and metal. There was no "processing" of the scrap as that term is generally understood. In addition, there are occasionally small sales to individual consumers, which did not exceed in all $3,500 a year during the period in question. All of these latter consignees, that is to say, these small individual consumers, and also all of the twelve firms just referred to, were located within the State of Maryland. They always paid the freight, deducting it from the purchase price paid to the defendant who had no dealings with the railroad with respect to these shipments. The bills of lading read: 'shipper's load and count.' Most of them contained the notation: scrap iron for remelting purposes only,' and some 'scrap iron for export only,' and the shipments were consigned to large industrial or shipbuilding plants, all within the State of Maryland. There were no billings to any points beyond the State."

We agree with the court below that the defendant was not a retailer within the meaning of the act. The exact language of the exemption, 29 U.S.C.A. § 213 (a) (2), is "any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce". It is elementary in the construction of statutes that words are to be given their "natural, plain, ordinary and commonly understood meaning", unless it is clear that some other meaning was intended (59 C.J. 975); and it would never occur to anyone, we think, to classify the business of a junk dealer as a "retail or service establishment." Junk dealers such as defendant buy in small quantities and sell in larger quantities, either to some other dealer or to a manufacturer or importer. A retailer is one who sells in small quantities to the ultimate consumer. 37 Words & Phrases, Perm.Ed., p. 502 et seq. "Typical retail establishments are grocery stores,

drug stores, hardware stores and clothing shops." Fleming v. A. B. Kirschbaum Co., 3 Cir., 124 F.2d 567, 572. The history of the act shows that it was in this sense that retail establishment was used. The exemption was not contained in the bill as originally introduced into Congress. S. 2475, H.R. 7200, 75th Cong. 1st Sess. May 24, 1937. It was added by an amendment, the purpose of which was to make clear that the act would have no application to "retail dry goods, retail butchering, grocers, retail clothing stores, department stores", located near and making occasional sales across state lines. 83 Cong.Rec. 7437–7438. Walling v. American Stores Co., 3 Cir., 133 F.2d 840, 843.

■ We think, however, that the lower court was in error in holding that plaintiffs were not engaged in the production of goods for commerce. They were engaged in handling scrap iron which was intended to be used and was used in the fabrication of ships. "Goods" as defined in the statute includes ships "or any part or ingredient thereof". Sec. 203(i). And "handling" is by express terms included in "production". Sec. 203(j). Plaintiffs handled scrap iron, an ingredient which was used in the manufacture of ships, and were therefore engaged in the production of goods within the statutory definition. There can be no question, we think, but that the production of ships to operate in interstate and foreign commerce is a production for commerce, within the meaning of the statute. See Newport News Shipbuilding & Dry Dock Co. v. N. L. R. B., 4 Cir., 101 F.2d 841, 843.

It makes no difference that the scrap iron handled by plaintiffs was sold by defendant to other scrap dealers before coming into the hands of the steel and shipbuilding companies by whom it was fabricated into ships. This was the destination expected and intended by defendant; and "the act extends at least to the employer who expects goods to move in interstate commerce". Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. ——; United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430. It is of no significance that all of the transactions to which the employer is a party occur wholly intrastate, where he expects that the goods produced will move in interstate commerce. It has been so held where he merely sells goods intrastate to one who he knows will sell them in interstate commerce. Thus in Walling v. Peoples Pack-ing Co., 10 Cir., 132 F.2d 236, all of the employer's products were sold intrastate. He knew, however, that approximately 4% thereof would pass into interstate commerce; and the employees handling this part were held within the provisions of the act. In Enterprise Box Co. v. Fleming, 5 Cir., 125 F.2d 897, 899, the employer was engaged in the manufacture and sale of cigar boxes. All its manufacturing was done in the State of Florida, and all its sales were made in that state to cigar manufacturers who shipped their products in interstate commerce. It was held that the employer was covered by the act, the court saying: "Production for interstate commerce includes the production of goods that the employer expects to move in interstate commerce". In S. H. Robinson v. Larue, 25 Tenn.App. 284, 156 S.W.2d 359, affirmed 178 Tenn. 197, 156 S.W.2d 432, the court thought it immaterial whether the owner of a junk yard sold his junk intrastate or interstate since he must have known that the scrap had no local use and was necessarily a product intended to move in interstate commerce.

■ Nor is the employer any the less within the coverage of the act because the goods which he sells intrastate are thereafter processed in the same state and then shipped in interstate commerce, so long as he knows, or has reason to expect, that this will occur. Thus in both the cases of Devine v. Levy, D.C., 39 F.Supp. 44 and St. John v. Brown, D.C., 38 F.Supp. 385, 388, employees were held within the coverage of the act where the employer was engaged in the production of crude oil which he sold intrastate and which was thereafter processed in the same state and then sold in interstate commerce. In the case last cited, which was cited with approval by the Supreme Court in Warren-Bradshaw Drilling Co. v. Hall, supra, Judge Wilson said: "The fact that the partnership here, owning and operating the lease and actually producing the oil, sold it, when so produced, to the co-partnership that gathered and transported it to a market, however intrastate that transaction might be, does not affect the question. The attitude of plaintiffs is, they had given the matter no thought and did not intend, or know, that their oil, or by-products of it, would pass into interstate commerce. They must be held to know that which is of such common knowledge that the courts may take judicial knowledge of it, viz., that the greater percentage of

all crude oil produced in Texas, certainly such as finds its way into major pipe lines, goes out of our State, though it may be in the form of by-products, for ultimate consumption."

In Allen v. Moe, D.C., 39 F.Supp. 5, the employer logged timber which he sold in the same state to a match company which made matches therefrom which it sold in interstate commerce. It was held that the employer was producing goods for interstate commerce. The court quoted from Sunshine Mining Co. v. Carver, D.C., 34 F. Supp. 274, 277, the following: "The expressions 'produced' and 'goods' in the Act indicate that Congress intended the Act to apply to employees engaged in producing goods which are processed further or changed as to form by other persons before going into interstate commerce." In Sunshine Mining Co. v. Carver, D.C., 41 F. Supp. 60, 62, a company which mined ores in Idaho and sold them to another company which smelted them in the same state and sold the product in interstate commerce was held within the coverage of the act, since it was engaged in producing goods expected to move in commerce and hence subject to the act "which reaches both those who are engaged in interstate commerce and those engaged in production of goods for interstate commerce."

It is well settled, too, that a local manufacturer or processor is subject to the provison of the act where his employees prepare "goods" which he knows another manufacturer will place in interstate commerce as an ingredient of a finished product or as a whole. Thus, in Davis v. Goodman Lumber Co., 4 Cir., 133 F.2d 52, we held that an employer was subject to the act when what his employees did was to glue wood strips to rollers which were furnished to him by a manufacturer of machinery and which were returned to the manufacturer and by the latter sold in interstate commerce. In Walling v. Kerr, D.C., 47 F.Supp. 852, 854, the employer dyed yarns which were sent to him by rug manufacturers who thereafter manufactured rugs out of these yarns and sold them in interstate commerce. It was held that the defendant was covered by the act, the court saying: " * * * the applicability of the Act is in no way limited to a situation in which one who produces goods is himself responsible for their subsequent movement in commerce. By its terms as thus defined the Act applies equally where the work is performed on any part or ingredient of an article of commerce." In Walling v. Higgins, D.C., 47 F.Supp. 856, a companion case to the above, the defendant owned a small business assembling books of samples for clothing manufacturers who in turn sent them to their customers in interstate commerce. The court held the defendant produced goods for commerce.

Very much in point is the decision of this court in Hamlet Ice Co. v. Fleming, 4 Cir., 127 F.2d 165, 169. In that case the employer was engaged in the production of ice which was sold to a railroad company and an express company and by them used for refrigeration of interstate shipments. In holding the employer covered by the act, the court, speaking through Judge Soper, said: "As to the intent of Congress to include within the scope of the act the particular intrastate activity now under consideration, there is no room for doubt, for as the Supreme Court pointed out in the Darby case, 312 U.S. [100] at page 120, 657, 61 S.Ct. 451, at page 461, 85 L.Ed. 609, 132 A.L.R. 1430, Congress expressly prohibited the production for commerce of the proscribed goods. It is true that there is a factual distinction between the Darby case and the case at bar, for in the former the producer manufactured the goods with the intent to ship all or part of them itself to extrastate consumers, while the appellant in the pending case manufactures the goods for shipment only by the carriers. The Supreme Court had no occasion to define the precise limits of the phrase 'production for commerce', but there can be no doubt that it relates to all goods that are expected to be transported in interstate commerce whether they are to be shipped by the maker or by some one else."

Since the plaintiffs were engaged in commerce within the meaning of the act as to practically all of defendant's business, therefore, and not merely as to the 4% embraced in direct interstate sales, questions as to allocation of time between interstate and intrastate business need not be considered.

For the reasons stated, the judgment appealed from will be reversed and the case will be remanded for further proceedings not inconsistent herewith.

Reversed and remanded.