LENROOT, Chief of Children's Bureau, United States Department of Labor, v. HAZLEHURST MERCANTILE CO. et al.

No. 620.

District Court, S. D. Mississippi, Jackson Division.

Jan. 6, 1945.

Amzy Steed and Harry Campbell, Jr., both of Birmingham, Ala., for plaintiff.

Henley & Woodliff, of Hazlehurst, Miss., for defendants.

MIZE, District Judge.

This cause having come on for trial on August 23, 1944, and the Court having considered the testimony adduced at the trial and the briefs filed by the parties, hereby makes and enters its Findings of Fact and Conclusions of Law, as follows:

### Findings of Fact

I. The plaintiff, Katharine F. Lenroot, is the Chief of the Children's Bureau, United States Department of Labor. The defendants, Hazlehurst Mercantile Company and Alford & Miller Company, are corporations organized and existing under the laws of the State of Mississippi, having their principal offices and places of business in Hazlehurst, Copiah County, Mississippi, within the jurisdiction of this Court.

II. Defendants, as copartners, doing business under the name and style of Hazlehurst Mercantile Company or Roper's Shed, were engaged during the vegetable packing and shipping seasons of 1941, 1942, 1943 and 1944 in the operation of a vegetable packing shed in Hazlehurst, Mississippi, handling principally cabbage and tomatoes. The cabbage shipping season in each of these years extended through the month of May, while the tomato shipping season extended through the month of June.

The shed is located on the west side of and adjacent to the tracks of the Illinois Central Railroad, and a spur track of this railroad runs alongside of the shed. Occupied entirely by the defendants during the vegetable packing and shipping season, the shed is a one-story frame structure approximately 360 feet long and 80 feet wide.

III. Most of the vegetables handled by defendants were obtained from farms in the general vicinity of the packing shed. The defendants own and operate farms, devoting some acreage to the cultivation of cabbage and tomatoes, which are later packed in their shed. However, the total amount of tomatoes cultivated on farms operated by defendants in their corporate capacities, which were later packed and shipped by them, constituted only about 5% of the approximately 75 carloads of tomatoes shipped during each of the 1941, 1942, 1943 and 1944 seasons, a carload containing approximately 675 lugs of tomatoes, weighing 30 lbs. each. Likewise, the total amount of cabbage cultivated on farms operated by defendants in their corporate capacities, which was later packed and shipped by them, constituted only about 5% of the approximately 150 carloads of cabbage shipped by them during each of said seasons. When cabbage is shipped in crates, a carload contains approximately 350 crates, weighing 85 lbs. each; and, when the cabbage is shipped in sacks, the carload contains approximately 500 sacks, weighing 50 lbs. each. The vegetables drawn from defendants' farms were commingled with those obtained from other sources upon their delivery to defendants' establishment.

Some 45% of the vegetables packed and shipped by defendants are grown on farms operated (1) by stockholders of the defendant corporations, (2) by subsidiary corporations, and (3) by growers whose operations are financed by the defendants, their stockholders and subsidiaries. These tomatoes and cabbage, too, were commingled by defendants with the tomatoes and cabbage procured from other sources.

In addition, approximately 10% of the cabbage and 33⅓% of the tomatoes shipped by them were graded, sorted and packed by farmers prior to sale and delivery to the defendants for shipment. These vegetables also were commingled by defendants with cabbage and tomatoes obtained from other sources and, notwithstanding the fact that the grading and packing operations had

been performed by the farmers, defendants' employees performed certain operations on such vegetables after their receipt in the packing shed, such as labelling the lugs, loading the lugs in the freight cars and "stripping" the lugs in the freight cars.

The remaining amount of vegetables (approximately 40% of the total cabbage pack and about 17% of the total tomato pack) shipped by the defendants consisted of cabbage and tomatoes which were obtained from farms other than those specified above and which were sorted, graded, prepared and packed in defendants' establishment.

IV. Briefly, after the tomatoes are unloaded at the shed, employees of the defendants handle them according to the following operations:

As the tomatoes are brought to the shed, they are unloaded from the farmers' containers called "field carriers" into "field carriers" of the defendants. Employees, known as graders, then inspect, grade and sort the tomatoes out of defendants' field carriers into the packers' bins. In this process the graders inspect the tomatoes for bruises, cuts, disfigurations, wormholes, blisters and other imperfections or defects. Defective tomatoes are removed from the bin and discarded. Simultaneously, the grader examines the nondefective tomatoes to determine the particular grade, according to size, that the tomatoes should be placed in, sorting out and separating the various grades and placing the tomatoes into bins especially provided for the particular grade. Tomatoes are graded, as to size, into three standard grades, commonly known, sold and purchased as "small", "small to medium" and "medium".

The wooden crates or lugs, the containers in which the tomatoes are packed, are constructed by other employees in the shed. The defendants purchase shooks of wooden material for the sides and bottoms of the containers and "unitized" wooden pieces for the ends of the containers which are in uniform and specified sizes and ready to be assembled. Defendants' employees make the wooden crates by fitting these pieces together around forms and then nailing them together. Employees, called "labelers" or "slop boys", then paste labels on the crates bearing one of the defendants' brand names. This operation of pasting on the labels is sometimes performed after the lugs have been constructed and before the tomatoes have been packed therein; at other times after the tomatoes have been packed

in the lugs and before the lugs have been loaded in the freight cars; and still at other times after the lugs have been placed in the freight cars. When the crates are completed, they are stacked at various places in the shed by employees, commonly called stackers. As the crates are needed by those employees engaged in packing the tomatoes, they are stacked on a shelf in front of the packers.

The packers stand in front of the bins, in each of which a uniform grade of tomatoes, graded according to size, either "small" or "small to medium" or "medium", has already been assembled. As they pack the tomatoes, the packers also grade them according to quality into three standard grades, commonly known, sold and purchased as U.S. 1, U.S. 2, and "commercial." The packer thus receives a crate from the shelf in front of him, takes the tomatoes by hand from the bins (selecting only tomatoes of the same grade, graded according to quality, until the particular crate is filled), wraps them individually in specially cut papers and packs them into standard 30-pound lugs. The lugs of tomatoes are then placed on a gravity conveyor on which they move to the east side of the shed. There, employees called "set-off boys" carry them to other employees who nail on the lids by hand. The lugs of packed tomatoes are then placed on another gravity conveyor on which they move directly from the shed into the freight cars assigned to the defendants and located on the spur track adjacent to the shed. At the height of the season, as many as five freight cars are being loaded at the same time. In the freight cars the lugs of packed tomatoes are taken from the conveyor by hand and loaded properly for shipment. Employees commonly called "strippers" secure them in place by long wooden strips called "car strips" to prevent movement and damage of the lugs in transit.

When defendants' customers order, they order a given number of lugs of tomatoes of a particular specified grade of quality and size. The defendants sell their tomatoes under the brand names of "A & M", "Diamond H", "A & M Meadowbrook", and "Hummer." The label bearing either the brand name "A & M" or "Diamond H" is pasted on every lug of U. S. 1 tomatoes, and the label bearing the brand name "A & M Meadowbrook" or "Hummer" is pasted on every lug of U. S. 2 tomatoes.

V. Operations relative to the sorting, grading, preparing, packing and shipping of cabbage are substantially similar to those involved in the sorting, grading, preparing, packing and shipping of tomatoes, and are as follows:

As the cabbage is unloaded from the farmers' trucks onto the floor of the shed, the cabbage is inspected, graded, and sorted into defendants' containers which hold approximately 100 pounds. In the process of inspecting, grading and sorting the cabbage, the defendants' employees who unload and grade the cabbage remove all defective cabbage and examine the nondefective cabbage to determine the particular grade or classification in which the cabbage should be placed. Depending upon the hardness of the cabbage and the texture of the leaves, the cabbage is graded into two standard grades, commonly known, sold and purchased as U.S. 1 and U.S. 2. After the cabbage is so graded and sorted from the farmers' trucks into defendants'. 100-pound containers, they are then dumped from these containers by other employees into the packers' bins which measure approximately 8 feet long, 4 feet wide and 2 feet deep.

Generally, the cabbage is packed and shipped in wooden containers constructed in the shed in the same manner as the tomato crates, referred to above, are constructed. After the cabbage crates have been constructed, labelers paste labels on the crates bearing one of defendants' brand names. The labeling operation is sometimes performed after the crates have been constructed and before the cabbage has been packed therein; at other times after the cabbage has been packed into the crates and before the crates have been placed in the freight cars; and still at other times after the crates have been placed in the freight cars. The cabbage crates are stacked at various places in the shed by employees, known as stackers, as the crates are completed. As the crates are needed by those employees engaged in packing the cabbage, they are stacked in front of the packers.

The packers stand in front of the bins, in each of which a uniform grade of cabbage, either U.S. 1 or U.S. 2, has been assembled. The packer thus takes a crate from in front of him, takes the cabbage by hand from the bins and packs them into standard 85 pound crates. The crates of cabbage are then placed on a gravity conveyor on which they move . to the east side of the shed. There, "set-off boys" carry them to other employees who nail on the lids by hand. The crates of packed cabbage are then placed on another gravity conveyor on which they move directly from the shed into the freight cars assigned to the defendants and located on the spur track adjacent to the shed. At the height of the season, as many as five freight cars are in the process of being loaded at the same time. In the freight cars the crates of packed cabbage are taken from the conveyor by hand and loaded properly for shipment. "Strippers" secure them in place by "car strips" to prevent movement and damages of the crates in transit. In some instances the cabbage is packed by the packers into burlap sacks, a packed sack weighing approximately 50 pounds and the cabbage is shipped in such sacks.

When defendants' customers order, they order a given number of crates or sacks of cabbage of a particular specified grade or quality.

VI. Defendants employed approximately 50 employees during the peak of the 1941, 1942, 1943 and 1944 seasons in all occupations in and about the packing shed.

The employees who performed the duties described above in paragraphs IV and V, hereof, both with respect to the tomatoes and cabbage and to the assembly of boxes, were not normally employed by defendants on their respective farms.

VII. C. A. Roper, president of the defendant Hazlehurst Mercantile Company, who owns substantially all of the stock in that corporation, is the active manager of the packing shed.

During the entire 1943 season, Mr. Roper's son, Pat Roper, 13 years of age at that time, was employed as a labeler in the packing shed. Notwithstanding the relationship existing between C. A. Roper and the defendant Hazlehurst Mercantile Company, this child was employed, compensated and terminated by the Hazlehurst Mercantile Company in its corporate capacity and not by his father.

VIII. In October, 1940, a representative of the Children's Bureau visited the defendants' establishment and explained to C. A. Roper, both orally and in writing, the provisions and requirements of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., concerning the employment of child labor.

IX. In June, 1941, in the midst of the 1941 vegetable packing season, an inspection of defendants' operations was made by a representative of the Children's Bureau, which disclosed that three children, 14 and 15 years of age, were working more than 8 hours per day, in excess of 40 hours per week and beyond 7 p.m. The plaintiff's representative informed C. A. Roper, both orally and in writing, that such employment constituted a violation of ' the child labor provisions of the Fair Labor Standards Act and, again, explained to him the requirements of the Act pertaining to child labor.

X. In June, 1942, in the midst of the 1942 packing season, another inspection of the defendants' operations was made, which disclosed the employment of one child under 14 years of age. This child, too, had worked beyond 10 p.m. and in a work place where vegetable crates were being constructed.

XI. In June, 1943, in the midst of the 1943 packing season, a third inspection of the defendants' operations was made. At that time three children under the age of 14 years were found working in the shed and nine children, 14 and 15 years of age, were found employed. Of these latter children, six had worked more than 8 hours per day and three had worked in excess of 40 hours per week.

XII. No inspection was made in 1944. Two children, 14 and 15 years of age, were employed in constructing tomato and cabbage crates or lugs during that season.

XIII. Practically all of the tomatoes and cabbage packed in the years 1941, 1942, 1943 and 1944 were shipped from the shed to points without the State of Mississippi, such shipments being virtually of daily occurrence; and the employees discussed in paragraphs VII, IX, X, XI and XII, hereof were employed in and about defendants' establishment within 30 days prior to the removal of such goods therefrom.

XIV. The defendants did not, nor did their foremen, request any of the children involved in this litigation to produce written proof of age either prior to or during their respective employments, and the defendants had not tried to obtain and did not have on file unexpired age certificates issued pursuant to the regulations of the Children's Bureau purporting to show the correct ages of any of these children.

XV. C. A. Roper testified, and the Court finds, that he intends to comply with the child labor provisions of the Act in the future. Ordinarily, the violations in this case have been such as would require the issuance of an injunction. However, the Court, having seen C. A. Roper and W. B. Alford, Sr., president of the defendant Alford & Miller Company, on the stand and knowing their general standing and reputations as substantial and law-abiding citizens, does not believe that the issuance of an injunction is necessary in this case to prevent further violations of the Act.

### Conclusions of Law

I. The Court has jurisdiction over the parties and of the subject matter involved herein under Section 17 of the Fair Labor Standards Act of 1938, Act of June 25, 1938, c. 676, 52 Stat. 1060, U.S.C.A., Title 29, Sec. 201 et seq., hereinafter referred to as the Act.

II. The handling sorting, grading, preparing, packing and shipping of tomatoes and cabbage, described hereinabove in findings of fact Nos. IV and V, constitutes the production of goods under Section 3(j) of the Act and defendants' packing shed is, therefore, a "producing" establishment within the intendment of Section 12(a) of the Act. Lenroot v. Western Union Telegraph Co., 2 Cir., 1944, 141 F.2d 400, certiorari granted, 1943, 322 U.S. 719, 64 S.Ct. 1057; Bracey v. Luray, 4 Cir., 1943, 138 F.2d 8; Fleming v. Kenton Looseleaf Tobacco Warehouse Co., D. C., E. D. Ky., 41 F.Supp. 255; Slover v. Wathen, 4 Cir., 1944, 140 F.2d 250; Walling v. McCracken County Peach Growers Ass'n, D. C., 1943, 50 F.Supp. 900; Walling v. Rockton & Rion Railway Co., D.C., 1944, 54 F. Supp. 342; Philips v. Star Overall Dry Cleaning Co., D.C., 1944, 55 F.Supp. 238.

III. The assembling of tomato and cabbage crates or lugs, discussed hereinabove in findings of fact Nos. IV and V, constitutes the production of goods within the contemplation of Section 3(j) of the Act, and defendants' establishment is, accordingly, a "producing" establishment under Section 12(a) of the Act.

IV. The children involved in this litigation are not employees "employed in agriculture" within the provisions of Sections 13(c) and 3(f) of the Act for the reason that the sorting grading, preparing, packing and shipping of tomatoes and cabbage by defendants are not practices performed as an incident to or in conjunc-

tion with defendants' own farming operations but are activities performed by defendants separate and apart as an independent commercial enterprise on tomatoes and cabbage grown on other farms as well as defendants' own. Bowie v. Gonzalez, 1 Cir., 1941, 117 F.2d 11; Calaf v. Gonzalez, 1 Cir., 1942, 127 F.2d 934; Walling v. McCracken County Peach Growers Ass'n, D. C., W. D. Ky., 1943, 50 F.Supp. 900; Redlands Foothill Groves v. Jacobs, S.D.Cal., 1940, 30 F.Supp. 995; Jordan v. Stark Bros. Nursery & Orchard Co., D.C., 1942, 45 F. Supp. 769; Walling v. Peacock Corporation, E.D.Wis., 1943, 58 F.Supp. 880; Walling v. Lincoln Looseleaf Warehouse Co., E.D.Tenn., 1942, 59 F.Supp. 601; Byus v. Traders Compress Co., W.D.Okl., 1942, 59 F.Supp. 18.

▆ V. In determining that the agricultural exemption provided in Sections 13(c) and 3(f) of the Act is inapplicable to defendants' packing shed employees, the Court holds that vegetables grown by the stockholders in the two corporations are not, as a matter of law, grown by the said corporate defendants and cannot be credited to them. Cf. Illinois Central Railroad Company v. Mississippi Cotton Seed Products Company, 1933, 166 Miss. 579, 148 So. 371. A fortiori, vegetables grown by subsidiary corporations or companies or vegetables grown by persons whose operations are financed by the defendant corporations cannot be credited to the defendants.

▆ VI. The assembling of tomato and cabbage packing crates or lugs from box shook or unitized materials constitutes manufacturing and processing occupation within the meaning of Section 3(l) of the Act and Child Labor Regulation No. 3, as amended. Hartranft v. Weigmann, 121 U.S. 609, 7 S.Ct. 1240, 30 L.Ed. 1012; American Fruit Growers v. Brogdex Co., 283 U.S. 1, 51 S.Ct. 328, 75 L.Ed. 801; Tidewater Oil Co. v. United States, 171 U.S. 210, 18 S.Ct. 837, 43 L.Ed. 139; Cochrane v. Deener, 94 U.S. 780, 24 L.Ed. 139; Walling v. Armbruster, D.C., W.D.Ark., 1943, 51 F.Supp. 166.

▆ VII. The employment of children under 14 years of age in defendants' packing shed during each of the 1942 and 1943 seasons constituted oppressive child labor within the meaning of Section 3(l) of the Act.

VIII. During the 1941 vegetable packing and shipping season, the employment of children, between 14 and 16 years of age, in defendants' packing shed for more than 8 hours per day, in excess of 40 hours per week and after 7 p.m. constituted oppressive child labor within the meaning of Section 3(l) of the Act and Child Labor Regulation No. 3, as amended.

IX. During the 1944 vegetable packing and shipping season, the employment of children between 14 and 16 years of age in the assembling of tomato and cabbage crates or lugs constituted oppressive child labor within the meaning of Section 3(l) of the Act and Child Labor Regulation No. 3, as amended.

▆ X. The employment of Pat Roper during the 1943 season was not encompassed by the "parental" exemption within the provisions of Section 13(c) of the Act, and thus constituted oppressive child labor under Section 3(l) of the Act, since this child was an employee of the defendant Hazlehurst Mercantile Company and not of his father and said corporation did not stand in the place of his parent.

[8] XI. During each of the 1941, 1942, 1943 and 1944 vegetable packing and shipping seasons, the defendants violated Section 15(a) (4) of the Act by shipping in interstate commerce goods produced in their establishment in or about which oppressive child labor was employed within 30 days prior to the removal of such goods therefrom.

▆ XII. For the reasons stated in finding of fact No. XV, it is not necessary that an injunction enjoining and restraining defendants from violating the provisions of Section 15(a) (4) of the Act should issue, and in the exercise of discretion is denied.

XIII. The Court concludes that the defendants should be taxed with the costs of the action.