WALLING, Administrator, Wage and Hour Division, United States Department of Labor, v. McCRADY CONST. CO.

No. 2394.

District Court, W. D. Pennsylvania.

March 28, 1945.

Irving J. Levy, Acting Sol., of Washington, D. C., Ernest N. Votaw, Regional Atty., and Bernard L. Barkan, Atty., Wage and Hour Division, United States Department of Labor, both of Philadelphia, Pa., and Geo. W. Jansen, Dept. of Labor, Wage and Hour Division, of Washington, D. C., for plaintiff.

SCHOONMAKER, District Judge.

This is an action brought pursuant to Section 17 of the Fair Labor Standards Act of 1938, c. 676, 52 Stat. 1060, 29 U.S. C.A. § 201 et seq. (hereinafter referred to as "the Act"), to restrain defendant from violating Sec. 15(a) (2) of the Act, 29 U.S. C.A., § 215(a) (2).

The case, which was heard on complaint, answer, and proofs, presents the question of whether certain employees of defendant, who were admittedly paid less than the minimum overtime rates, are within the meaning of the Act. If they are, then the plaintiff is entitled to an injunction to restrain violations of the Act as to such employees who are found to be within the coverage of the Act.

The evidence disclosed that under fifty-eight different contracts relating to the maintenance, repair, reconstruction, and construction of different transportation, communication and industrial facilities, defendant employed workmen who were not paid in accordance with the provisions of the Fair Labor Standards Act.

We shall discuss the work done under these contracts under six main categories, i. e.:

I.  Public highways, roads and bridges
II.  Motor carrier terminal facilities
III.  Telephone facilities
IV.  Railroad facilities
V.  Industrial Plant facilities
VI.  Loading iron ore and limestone

### I.

Fourteen contracts involved in this case called for work in the maintenance, repair or construction of public highways, roads, and bridges in the Commonwealth of Pennsylvania.

The plaintiff contends: (1) that the highways, roads, and bridges on which defendant's employees worked, are all instrumentalities of interstate commerce; that therefore all of defendant's employees engaged in maintaining and repairing thereof, were "engaged in commerce" within the meaning of the Act; (2) that inasmuch as said highways, roads, and bridges are located in and about a large industrial area devoted to the production of goods for commerce—and were used in such production—the employees engaged in their maintenance and repair, were "employed * * * in a process or occupation necessary to the production of goods for commerce" within the meaning of the Act.

The defendant contends that the Act does not apply to any of its activities under the highway contracts involved in this suit, because: (a) Section 3(d) specifically states that the word "employer", as used in the Act, "shall not include the United States or any State or political subdivision of a State"; (d) that the streets and highways involved in this suit are local in their character, and not instrumentalities of interstate commerce; and (c) that the Act applies only to repair and maintenance work, does not apply to new construction, and that in instances where new construction only is involved, is not applicable for that reason. These contentions are without merit.

■ As to the first contention, in carrying out these highway contracts for the Commonwealth of Pennsylvania, or any of its political subdivisions, defendant is an independent contractor. The employees involved worked for the defendant, not for the United States, nor any State or political subdivision thereof. There is no evidence showing any employer-employee relationship between defendant's employees and the contracting States or political subdivisions thereof. We therefore hold that defendant's employees are not within the scope of this exception of the Act. See Walling v. Craig, D.C., 53 F.Supp. 479, 483; Walling v. Patton-Tulley Transportation Co., 6 Cir., 134 F.2d 945, in which the court said on page 949: " * * * The argument that it was the Congressional intention to make the Fair Labor Standards Act inapplicable to work under government contract, must be rejected. No reason appears why contractors for the government are to be permitted to maintain substandard labor conditions while private contractors are prohibited from so doing, and such view would thwart the clearly defined purpose of the Congress, particularly if applied at a time when all, or nearly all, major industries are operating upon government contract."

Nor does the fact that the economic burden of complying with the Act might be carried on to the State, and to political subdivisions thereof, constitute a valid objection to complying with the Act. See Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 482, 140 A.L.R. 615; Curry v. United States, 314 U.S. 14, 62 S. Ct. 48, 86 L.Ed. 9; James v. Dravo Contracting Co., 302 U.S. 134, 160, 58 S.Ct. 208, 82 L.Ed. 115, 114 A.L.R. 318.

■ As to the second contention whether or not the highways involved in this case are instrumentalities of interstate commerce, the test to be applied in determining whether or not this Act applies, has been stated by the United States Supreme Court in Overstreet in North Shore

Corporation, 318 U.S. 125, at pages 129, 130, 63 S.Ct. 494, at page 497, 87 L.Ed. 656, as follows: "We think that practical test should govern here. Vehicular roads and bridges are as indispensable to the interstate movement of persons and goods as railroad tracks and bridges are to interstate transportation by rail. If they are used by persons and goods passing between the various States, they are instrumentalities of interstate commerce. Cf. Covington & Cincinnati Bridge Co. v. Kentucky, 154 U.S. 204, 218, 14 S.Ct. 1087, 1092, 38 L.Ed. 962. Those persons who are engaged in maintaining and repairing such facilities should be considered as 'engaged in commerce' even as was the bolt carrying employee in the Pedersen case, supra. [Pedersen v. Del. Lack. & West. R. R. Company, 229 U.S. 146, 33 S.Ct. 648, 57 L.Ed. 1125, Ann.Cas.1914C, 153] because without their services these instrumentalities would not be open to the passage of goods and persons across state lines. And the same is true of operational employees whose work is just as closely related to the interstate movement. Of course, all this is subject to the qualification that the Act does not consider as an employer the United States or any State or political subdivision of a State, and hence does not apply to their employees. § 3(d)."

From the evidence in this case, we find that roads, highways and bridges involved herein are instrumentalities of interstate commerce, and that the persons engaged in maintaining and repairing them are engaged in such commerce. The factors that lead to this conclusion are these:

(1) Pittsburgh is the center of a large industrial area encompassing Allegheny, Beaver, and Westmoreland Counties. It is the greatest iron-and-steel producing area of the world. It is also a leading industrial center in other industries; i. e., electric equipment, chemicals, plate glass, railroad supplies, machinery and parts, slaughtering and meat packing, paper, printing, etc. Raw materials for these industries move constantly by road and rail, and by road alone, between this area and other States. Traffic-density tests in the Pittsburgh area over a one-year period revealed that 155,983 motor vehicles passed through ten test-stations every twenty-four hours. 21,860 were commercial vehicles, most of them trucks. They originated in twenty-seven different States, and were moving to twenty-two States. Although the proportion of interstate travel varied among sta-

tions, it never fell below 64%. 63% of the trucks and 19% of the buses were making interstate trips.

(2) The streets and highways involved in defendant's repair and maintenance contracts are roads available and regularly used by persons and goods moving among the several States. They are therefore instrumentalities of commerce.

Among the streets and highways repaired and reconstructed by defendant, are portions of United States Highways 22 and 30. These highways are systems of interstate roads between important points. United States Highway 22 runs from Cincinnati, Ohio, through Pennsylvania and other States to New York. United States Highway 30 runs continuously from Oregon to Atlantic City, New Jersey. Each section of these highways covered by defendant's contracts is also a part of the Federal Aid System of Highways, part of the principal traffic routes of military importance designated by the War Department, and a part of the inter-regional Highway System tentatively selected by the National Research Council.

We are of the opinion that the evidence clearly establishes the fact that the streets worked on by the defendant, constituting portions of these United States Highways 22 and 30, are used by "persons and goods passing between various states", and therefore are "instrumentalities of commerce". In fact, the proofs in this case clearly show that all the roads of any importance in the Pittsburgh Area carry persons and goods in interstate commerce.

The chief work done by defendant and its employees was the removal of old pavement and the laying of new. The work was done by various kinds of employees, i. e.,—foremen, timekeepers, service drivers, tractor operators, power-shovel operators, oilers and greasers, grader operators, crane operators, power operators, finishing-machine operators, roller operators, form setters, finishing blocklayers, laborers, flagmen, water boys, and watchmen. All their work was immediately related to the repair of roads. All were employed on the job site, except service drivers who were employed in hauling parts and tools to the site to make repairs to machinery and equipment, and to carry directions for the prosecution of the work. They were all engaged in commerce within the meaning of the Act. See Overstreet v. North Shore Corporation, supra; Pedersen v. Fitzger-

ald Co., 318 U.S. 740, 63 S.Ct. 558, 87 L. Ed. 1119, (reversing 288 N.Y. 687, 43 N.E. 2d 83); North Shore Corporation v. Barnett, 5 Cir., 143 F.2d 172; Walling v. Craig, supra; Walling v. Patton-Tulley Transportation Co., supra.

As to Campbell's Run Road, a public highway which connects U. S. Highways 22 and 30 with the City of Carnegie, Pennsylvania, we are of the opinion that it is an instrumentality of interstate commerce, even though it is a county road, because the evidence shows that out-of-state traffic goes over this road from Carnegie to and from points in Ohio. Then, too, this road is regularly used in the transportation of persons and goods between the various states. It is regularly used in the pickup and delivery of mail and freight, a substantial portion of which moves in interstate commerce. The same kind of employees who worked on this job were employed on the jobs on Routes 22 and 30, above referred to. The character of the work was the same, with the exception that in Campbell's Road the existing road was widened and straightened. In addition, two bridges forming part of the highway were replaced by new bridges at apparently the same locations. This road, as reconstructed, followed the same route as before and was used by the same traffic. But it remained the same instrumentality of commerce. (See Pedersen v. Fitzgerald, supra). In this case, the abutments of two interstate bridges had been damaged by flood and the substructures of two others damaged; and the plaintiff constructed entirely new abutments under two bridges and repaired the substructures of the others. The court held on authority of Overstreet v. North Shore Corporation, supra, that the employees were engaged in commerce and entitled to the benefits of the Act.

The principle to be applied in the instant case is illustrated in Walling v. Patton-Tulley Transportation Co., supra, in which the Circuit Court of Appeals of the Sixth Circuit concluded that work on entirely new dikes and revetments on the Mississippi River was covered by the Act, even though the construction work was new, because the river was a highway of commerce.

As to Duquesne Way, a street in the City of Pittsburgh, twelve blocks long and lying on the Allegheny River side of Pittsburgh's "Golden Triangle", we hold that to be an instrumentality of commerce. It is used frequently each day in the pickup and delivery of interstate mails, express and freight. Terminals of four interstate carriers are located on it, and it is used daily by trucks beginning or ending interstate journeys. The Pennsylvania Railroad Freight Depot is also located at one end of this street, and it is used constantly by freight to and from the States in the course of interstate journeys. Since this street is an instrumentality of interstate commerce, the work done therein by defendant's employees in repaving and in repairing its drains, sidewalks and sewers, constituted employment in commerce.

The final question in the instant case as to defendant's highway activities involves the contracts with Allegheny County, Pennsylvania, whereby defendant repaired certain streets and replaced an obsolete and dangerous bridge, which together constitute a main through-traveled route from the Borough of Wilkinsburg through the Boroughs of Edgewood, Swissvale and North Braddock to the Borough of East Pittsburgh from United States Highways 22 and 30 in the Borough of Wilkinsburg to United States Highway 30 in the Borough of East Pittsburgh. The streets involved are Edgewood Avenue in Edgewood, Hawkins and Bell Avenues in North Braddock, Center and Bessemer Streets in East Pittsburgh. It also involves Dooker's Hollow Bridge. All of these streets and this bridge constitute main thoroughfares in said boroughs. These streets are used primarily for local traffic. But being also used by persons and goods passing between various States, they are therefore instrumentalities of interstate commerce. That, we think, is sufficient to bring them within the interstate commerce rule. They are used daily in the pickup and delivery of interstate mails, interstate express and interstate freight. Every day fourteen trucks of the North Braddock Motor Lines, moving in interstate commerce, used Edgewood Avenue, Hawkins Avenue, and Dooker's Hollow Bridge. In our view, the interstate use of these streets and the Dooker's Hollow Bridge was not so trivial and sporadic as to be disregarded as de minimis. We therefore hold they were instrumentalities of interstate commerce.

(3) Defendant's third contention is that the Act applies only to repair and maintenance work on highways, and not to new construction thereon; that there-

fore in those instances where there was new work on such highways, the Act does not apply. We cannot agree with that contention. In most of the highways involved in this case, where defendant claims the work was new,—even though the road follows the old—it relies on the magnitude, of the work, notwithstanding the work was on the old road. In such cases there is no doubt that the work done by defendant was repair or reconstruction of an instrumentality of interstate commerce. In some instances, parts of the highway were relocated following the general location of the old highway, and served the same purpose. In those cases we are of the opinion the work done by the employees falls squarely within the Act. In such instances, the work done was clearly to improve portions of a highway that was used in interstate commerce.

■ There are also other independent reasons why defendant's employees should be held within the coverage of the Act. Section 3(j) provides that for the purpose of the Act, any person employed in "any process or occupation necessary to the production" shall be considered as "engaged in the production of goods." The industrial character of the Pittsburgh area and the extent to which its streets and highways are used in carrying persons, raw materials and goods in process of fabrication to factories, is a factor to be considered. The roads and the work of the employees who repair and reconstruct them are indispensable to the continuance of production of goods moving in interstate commerce. Consequently it may properly be held that defendant's employees working on the roads are covered by the Act, not only because they are engaged in commerce under the Overstreet decision, but because they are also engaged in the production of goods that move in interstate commerce.

## II.

■ The next phase of the case relates to activities of defendant's employees in repairing motor carrier facilities. Under contract with Motor Freight Express, Inc., defendant's employees resurfaced the concrete apron about a loading dock, and excavated for an additional gasoline tank at the terminal of the Motor Freight Express, Inc. This corporation is engaged in interstate commerce. All the goods carried by it move interstate. The loading and unloading thereof is interstate commerce. (See Fleming v. Jacksonville Paper Co., 5 Cir., 128 F.2d 395, 398, affirmed 317 U. S. 564, 63 S.Ct. 332, 87 L.Ed. 460). The concrete apron which defendant's employees resurfaced was a facility by which this commerce was carried. We hold therefore that the employees resurfacing this apron were engaged in commerce and covered by the Act. The extension of facilities for fueling the trucks at this terminal was also a mere addition to an existing facility of interstate commerce.

## III.

■ The next phase presented is whether or not defendant's employees working on telephone facilities, both trunk lines and local lines used for interstate communications, are within the coverage of the Act. We are of the opinion that the entire telephone system, both local and through lines, is within the coverage of the Act, for they are all parts of the same system which furnishes interstate communication service. Schmidt v. People's Telephone Union, 8 Cir., 138 F. 2d 13; National Labor Relations Board v. Central Missouri Telephone Co., 8 Cir., 115 F.2d 563; National Labor Relations Board v. J. G. Boswell Co., 9 Cir., 136 F.2d 585. The work of defendant's employees was done in the maintenance and repair of an instrumentality of interstate commerce, and these employees engaged therein were employed in commerce.

■ The question, however, arises in this case of whether or not work of defendant's employees in providing additional telephone facilities to improve the system and make it more flexible is within the coverage of the Act. The facts as to this construction were as follows:

As a part of its network, the Bell Telephone Company also maintained a trunk route between the central offices of Sterling and Grant and other offices, which was designated "Normal Route for Trunks between Sterling and Grant and other offices". This trunk was regularly and continuously used for communication between the City of Pittsburgh and various States. In order to provide additional facilities and to improve the system by making it more flexible, relieving the congestion on the Sterling-Grant trunk, a new trunk was set up between the Sterling office and the Montrose office, known as the Sterling-Montrose office.

Under a contract with the Bell Telephone Company, dated April 14, 1941, defendant and its employees constructed the tile ducts for this new Sterling-Montrose trunk. They installed a new tile duct beginning at Rural Street in East Liberty, Pittsburgh, and along St. Clair Street up to Margaretta Street, placing it alongside an existing duct, thus "reinforcing" that line. From that point, new duct was installed from St. Clair Street to North Negley Avenue, and on North Negley Avenue to Black Street, from there to Stanton Avenue, to Swan Way, and from Swan Way as far as Gale Street to Gale Way, then to Butler Street to the Pennsylvania Railroad tracks, and then to the bank of the Allegheny River. At certain points along this route there were facilities of the telephone company and it was unnecessary to put in new tile or reinforce the old. For the remaining distance new ducts were installed. After the completion of the tile ducts, trunk cables were pulled through, which provided direct service connecting the Sterling office with the Montrose office. Over these trunks interstate calls could be, and were made by subscribers of the telephone company. After the installation of the direct service A trunks, one percent of the regular traffic was in interstate commerce.

In our opinion, the construction of this link in the telephone system was work on an instrumentality of commerce, and it facilitated the continued flow of interstate communications. The work was as closely linked to the transmission of interstate messages as a repair or enlargement of existing lines. We therefore conclude that the work on this link is within the coverage of the Act.

IV.

The next question we have to consider is whether the employees working on projects in connection with the Union Railroad Company were within the coverage of the Fair Labor Standards Act. Our conclusion is that they were. The Union Railroad is a switching railroad serving industrial plants in the Pittsburgh area. A substantial part of tonnage carried by this railroad originated at out-of-State points, or was moved to points outside Pennsylvania. It was thus engaged in interstate commerce. It is therefore an instrumentality of interstate commerce, and any work done in the main-

tenance and reconstruction of that railroad is employment in commerce within the meaning of the Act. Overstreet v. North Shore Corporation, supra; Pedersen v. Fitzgerald, supra. This railroad performs other services in connection with production in the steel mills in this area, such as handling and moving ore, molten metals, molds, and slag, between plants and to cinder dumps. This, we think, also brings the railroad's employees within the coverage of Section 3(j) of the Act. This section provides that an employee shall be engaged in production of goods if he is employed "in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof." See Bracey v. Luray, 4 Cir., 138 F.2d 8; Mid-Continent Pipe Line Co. v. Hargrave, 10 Cir., 129 F.2d 655. See also our opinion Shepler v. Crucible Steel Co., 60 F.Supp. 260, wherein plaintiffs were seeking to recover from Crucible Steel Company compensation for overtime under the Fair Labor Standards Act. The plaintiffs in that case were watchmen on a barge-landing maintained by the Crucible Fuel Company along the Ohio River where its barges carrying coal were moored. This coal was in transit to the Crucible Steel Company which was engaged in manufacturing iron and steel, which products were sold and delivered by the Steel Company in interstate commerce. The coal transported did not itself move in interstate commerce, but was converted into coke at the plant of the Steel Company. This coke was used in the process of manufacturing the steel and iron that went into interstate commerce. In our opinion filed February 3, 1943, 60 F.Supp. 260, we said:

"On these facts it is our view that plaintiffs were engaged in occupations 'necessary to the production' of iron and steel which go into interstate commerce. Without fuel the furnaces of the Steel Company could not operate at all. The fact that the Steel Company uses as a medium for getting that fuel to its furnaces a wholly-owned and controlled subsidiary corporation, the Crucible Fuel Company, does not withdraw the employees of that subsidiary corporation from the provisions of the Fair Labor Standards Act. Those engaged in the mining of coal and transporting it from the mines to the furnaces, are engaged in an occupation 'necessary to

the production of goods for commerce'. Whether they work for the Steel Company directly, or for a wholly-owned subsidiary, can make no difference, because without fuel you cannot operate a furnace in a steel mill.

"In our opinion, this case falls squarely within the ruling of the Supreme Court in Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, holding that employees of an owner of a building who were engaged in its maintenance and operation, were engaged in an 'occupation necessary to the production' in interstate commerce, where the tenants of the building were engaged principally in the production of goods for interstate commerce. In the instant case, I would say the necessity is much stronger than in Kirschbaum v. Walling, supra, because you cannot make steel at all without heat in the furnaces; and the Fuel Company is owned by the Steel Company.

"We therefore conclude that the Fair Labor Standards Act of 1938 is applicable to plaintiffs as employees of defendant Fuel Company."

The judgment in that case was affirmed by the Circuit Court of Appeals (Shepler v. Crucible Fuel Co., 3 Cir., 140 F.2d 371), which assumed, without deciding, that the Act was applicable to the plaintiff in that case.

Now, particularly referring to the work actually done by defendant and its employees for the Union Railroad Company, they constructed a viaduct, known as Munhall Arches, carrying two main tracks of the Union Railroad Company. They reconstructed the Breick Hollow Arch, which elevated the railroad track over the underpass of the Breick Hollow Arch. They reconstructed a similar arch at Clairton Junction. They repaired the East Pittsburgh and Clairton viaducts of the Union Railroad Company. The defendant and its employees also made repairs to the coaling station at Clairton, which was used as an integral part of the railroad facilities in transporting interstate goods. They constructed a substructure for an M. O. Tower with necessary retaining wall for housing interlocking and signal equipment to replace an old structure used for the same purpose. At a result of its design and location, it could have no other use. It is an integral part of existing railroad facilities functionally, and essential to their operation. Defendant and its employees made repairs to Hill Station Roundhouse, which was used for the repair and inspection of its steam locomotives. Defendant and its employees also did the grading and substructure construction of a consolidated maintenance-of-way shop, storehouses, and garage to house the Railroad's maintenance-of-way facilities, which had been scattered at various points along the Railroad's right of way.

■ Our conclusion is that defendant's employees, in working on the several jobs above enumerated, were engaged in commerce and the production of goods for commerce. The fact that the defendant itself is engaged in construction, and not production, is of no moment. The test is the character of the work of the employees. Kirschbaum v. Walling, 316 U. S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Walling v. Sondock, 5 Cir., 132 F.2d 77 (certiorari denied 318 U.S. 772, 63 S.Ct. 769, 87 L.Ed. 1142).

■ We consider next the question of whether or not defendant's employees working on railroad facilities in connection with industrial plants, are engaged in commerce and the production of goods for commerce. We take up first the railroad trestle build at the Wood Works of the Carnegie-Illinois Steel Corporation. In this connection, defendants and its employees reconstructed a concrete floor for said railroad trestle. The Carnegie-Illinois Steel Corporation produces goods for interstate commerce at its Wood Works, at which it receives materials in interstate commerce, and ships goods in interstate commerce via the Union Railroad Company. This Corporation also moves freight within the steel plant, dumping waste and hauling steel products and raw materials between mills and between the various trunk lines and the mills. Our conclusion is that the work done by the defendant's employees was covered by the Fair Labor Standards Act. The fact that the trestle was located within the Wood Works rather than on the main line of the Union Railroad, only emphasizes the importance of this trestle for the production of goods for commerce.

We consider now the industrial spurs constructed at the Linde Air Products Company's plant. In June 1939, the Union Railroad Company constructed a side-track on its right of way and the yard-tracks of the Linde property. Defendant's employees did the grading for the work. In

and after this construction, interstate shipper·s moved in and out of the plant over them.

At the plant of the Wm. B. Scaife Company along the Pennsylvania Railroad, defendant's employees did the grading and installed the railroad tracks for a similar siding. The Scaife Company is engaged in the production of domestic-range boilers, hot-water heaters, pneumatic tanks, gas cylinders, etc., for shipment in interstate commerce. At the request of the United States Government, defendant built an additional structure within the site of this plant; and in connection therewith, constructed a railroad siding to facilitate the movement of construction materials and the shipment of munitions produced. Defendant's employees worked on this siding. It is perfectly plain that these railroads spurs and sidings are necessary to facilitate the movement of interstate commerce to and from these plants. While they were not integrated into existing commerce or existing production, nevertheless they were clearly necessary for the production of goods for commerce, and therefore covered by the Fair Labor Standards Act.

As to the Linde Air Products Company underpass, while the Linde Company was building its new plant for the production of liquid oxygen, the Union Railroad Company assigned to defendant the work of constructing an underpass under two main lines of the Railroad running adjacent to the plant-site, to avoid a level grade-crossing at the point of entry to the Linde plant. We are of the opinion that the defendant's employees engaged in this work were covered by the Act, by reason of the fact that the elimination of accident hazards is an integral part of commerce in which the Railroad was engaged.

■ In regard to the remaining contracts involved in this suit on which defendant and its employees worked, they involve various kinds of maintenance, repairs, replacements, and construction of plant-facilities in three large industrial establishments which ship their products in interstate commerce; i. e.,—Carnegie-Illinois Steel Corporation, Westinghouse Electric & Manufacturing Company, and the William B. Scaife Company. The work done was an integral part of the normal maintenance and operation of their respective plants. Part was the repair, reconstruction and modification of existing facilities. The remainder was the construction of new units which were designed for use in the production of particular goods. These new units were all integral parts of existing plants, and were constructed to enlarge or replace outmoded buildings and machinery, and thus to continue the operation of the plant as a whole.

Concerning the work done by defendant's employees on these various jobs, we can say, in the language of Mr. Justice Frankfurter in Kirschbaum v. Wailing, 316 U.S. 517, 525, 62 S.Ct. 1116, 1121, 86 L.Ed. 1638: " * * * In our judgment, the work of the employees in these cases had such a close and immediate tie with the process of production for commerce, and was therefore so much an essential part of it, that the employees are to be regarded as engaged in an occupation 'necessary to the production of goods for commerce.' "

In this case, it was settled that maintenance employees engaged in supplying heat, light and water, and maintaining a safe and habitable building, were covered by the Act.

In Walton v. Southern Package Corporation, 320 U.S. 540, 64 S.Ct. 320, 88 L.Ed. 298, it was held that the Act applied to a watchman whose duty was to aid in protecting a building, machinery, and equipment from injury or destruction by fire.

In Bowie v. Gonzalez, 1 Cir., 117 F.2d 11, 20, the Circuit Court of Appeals held "dead" season employees who were "engaged in the repair and maintenance of the milling and transportation facilities" of a company engaged in gathering and refining sugar cane, were covered by the Act.

In Consolidated Timber Co. v. Womack, 9 Cir., 132 F.2d 101, 106, the phrase "necessary to the production" was held to embrace cooks in a lumber camp.

In Holland v. Amoskeag Machine Co., D.C., 44 F.Supp. 884, the court held that employees engaged in a machine shop repairing machines for use elsewhere in the production of goods for commerce, and employees producing steam sold to factories for use in heating the building and in the productive processes, were in the coverage of the Act.

In Mid-Continent Pipe Line Co. v. Hargrave, 10 Cir., 129 F.2d 655, 657, the court

held that watchmen engaged in guarding pipe lines carrying crude petroleum to a refinery engaged in "production of goods for commerce", were within the meaning of the Act.

In Bracey v. Luray, 4 Cir., 138 F.2d 8, the court held that employees engaged in sorting and loading scrap-iron which was thereafter sold intra-state to the scrap dealers, who in turn shipped in intra-state to processors producing goods for interstate commerce, were covered by the Act.

We list below the activities of defendant's employees which we find to be within coverage of the Act:

(1) The repair of the foundation of the steam hammers at the McKees Rocks Works of the Carnegie-Illinois Steel Corporation.

(2) The drainage ditch at the Irwin Works of the Carnegie-Illinois Steel Corporation, which was lined with concrete to improve its usefulness.

(3) The Irwin Works Roadways of the Carnegie-Illinois Steel Corporation.

(4) The Scaife crib-wall built by William B. Scaife Company along the Allegheny River adjacent to the Scaife plant to prevent erosion of the plant-yard.

(5) The Maintenance Office of the Irwin Works of the Carnegie-Illinois Steel Corporation, in which defendant's employees removed a brick floor and replaced it with a concrete floor.

(6) The Cold Mill foundation of the Carnegie-Illinois Steel Corporation, where defendant's employees were engaged in filling in an obsolete cold mill so that it could be used for storage and warehouse space.

(7) The William B. Scaife Company sewers where defendant's employees extended the sewers to shift the outlet downstream below the intake pipe of the plant's water supply.

(8) The leading platform of the Trafford Works of the Westinghouse Electric & Manufacturing Company, where defendant's employees tore out an existing loading platform and constructed a concrete platform.

(9) At the Irwin Works of the Carnegie-Illinois Steel Corporation, where the defendant's employees constructed foundations for relocating a down tilter, which was used in the production of steel.

(10) The annealing furnace bases at the Irwin Works of the Carnegie-Illinois Steel Corporation, which defendant's employees constructed.

(11) East Pittsburgh Turtle Creek Road, which was graded by defendant's employees so that it could be used as a roadway by trucks for the transportation of goods in process of production for commerce.

(12) Acid disposal facilities at the Irwin Works of the Carnegie-Illinois Steel Corporation. Defendant's employees constructed a concrete trench for waste acids.

(13) Electrolytic tinning plant at the Irwin Works of the Carnegie-Illinois Steel Corporation. Defendant's employees built the floor and foundation which was a part of an existing establishment producing goods for interstate commerce.

(14) Plate shearing line at the Irwin Works of the Carnegie-Illinois Steel Corporation. Defendant's employees built the concrete foundation for this shearing line.

(15) Weigh and traffic office at the Irwin Works of the Carnegie-Illinois Steel Corporation, for which defendant's employees built the foundation. This construction was so intimately bound up with the production processes that it could not be carried on without it, and therefore within the coverage of the Act.

(16) Tin Plate Building Extension—Gas Cleaner Leantos. Defendant's employees constructed the foundations at the Irwin Works of the Carnegie-Illinois Steel Corporation. Both structures were necessary for the operation of the Works, and physically and functionally bound up therewith.

## VI.

Under two separate contracts, defendant's employees loaded into railroad cars, iron ore and limestone at Cranesville, Pennsylvania, and Gascola, Pennsylvania. These products had been previously stored at these points by the Carnegie-Illinois Steel Corporation. After they had been loaded by defendant's employees, they were transported to the Carnegie-Illinois Steel Corporation's plant at Pittsburgh, where they were processed into iron and steel products. "Goods" as defined by the Act, include "any part or ingredient thereof" Sec. 3(i), and "handling" is by express terms included in production. Sec. 3(j). We are of the opinion that this work was clearly within the coverage of the Act. Bracey v. Luray, 4 Cir., 138 F.2d 8.

Generally, in regard to all of the activities of the defendant involved in the case, defendant seeks to draw a distinction between repair and reconstruction of existing facilities, and new construction, contending that new constructions are not covered by the Act. It bases this contention on the ruling of the Supreme Court in the cases involving an interpretation of the Federal Employers' Liability Act, 34 Stat. 232, as re-enacted and changed by the act of April 22, 1908, 35 Stat. 65; 45 U.S.C.A. § 51, that the Congress could constitutionally regulate only employees engaged in "transportation". The Employers' Liabilities Cases, 207 U.S. 463, 28 S.Ct. 141, 52 L.Ed. 297; New York, N. H. & Hartford R. Co. v. Bezue, 284 U.S. 415, 52 S.Ct. 205, 76 L. Ed. 370, 77 A.L.R. 1370. However, in a later case, Virginian R. Co. v. System Federation No. 40, 300 U.S. 515, 563, 57 S.Ct. 592, 81 L.Ed. 789, the Supreme Court held that The Employers' Liabilities Cases, supra, was not controlling as to the power of Congress to regulate labor in railroad-repair shops, and that such laborers came within the scope of the Act. In connection with the consideration of the cases holding that The Employers' Liability Act applies only to transportation, it may be noted that the Act was amended in 1939, 45 U.S.C.A. § 51, so that it now applies to any employee "any part of whose duties * * * shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and sul. antially, affect such commerce * * *."

We therefore conclude that the rulings of the Supreme Court upon the Federal Employers' Liability Act furnish us no guide to aid us in the determination of the proper application of the Fair Labor Standards Act.

We are of the opinion that under this Act, there is no distinction between maintenance of existing facilities of commerce, and improvement or extension thereof by new construction. In Warren-Bradshaw Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 126, 87 L.Ed. 83, the Supreme Court made no such distinction where oil-well drillers were employed in drilling new oil wells in the Panhandle Oil Field of Texas. That certainly was not repair or maintenance work. The Supreme Court held that they were engaged in a "process or occupation necessary to the production" of oil, some of which ultimately found its way, when produced, into interstate commerce, and were therefore within the provisions of Section 3(j) of the Act.

Our conclusion is therefore on the whole of the transactions involved in this case that the plaintiff is entitled to an injunction, as prayed for.

Our findings of fact and conclusions of law are filed herewith. An order for judgment in accordance therewith may be submitted on notice to opposing counsel.